## COMMONWEALTH vs. JERRY G. ADREY.

Essex. October 2, 1978. — December 4, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Evidence*, Cross-examination. *Practice, Criminal*, Suppression of evidence by prosecutor, Disclosure of evidence, Mistrial, Instructions to jury, Capital case.

Where defense counsel at a criminal trial was permitted to establish that a prosecution witness was under the influence of drugs at the time of the crime, there was no error in refusing to allow defense counsel to inquire further to establish a pattern of drug addiction or treatment without also showing how that information would affect the witness's credibility. [751-752]

Where defense counsel at a criminal trial had elicited on cross-examination of a prosecution witness that the Commonwealth had granted the witness immunity and dropped a number of unrelated bad check charges, the judge did not err in excluding a specific question as to where the witness had gotten the checks while preserving counsel's right to explore the witness's motive. [572-753]

At a criminal trial, a mistrial was not required on the ground that the prosecution suppressed exculpatory evidence where there was no indication that the allegedly exculpatory evidence was made known to or recorded by the police, where the evidence was not material to the defendant's innocence, and where defense counsel was able to make effective use of the evidence when it surfaced during the trial. [753-755]

A judge at a criminal trial did not err in his instructions to the jury with respect to reasonable doubt. [755-756]

A judge at a criminal trial did not err in instructing the jury that the Commonwealth need not prove that a criminal act could not have been done by anybody other than the defendant or prove that no other person than the defendant had an opportunity to do it. [756]

INDICTMENT found and returned in the Superior Court on May 23, 1974.

The case was tried before *Ronan*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Michael T. Stella, Jr.,* Assistant District Attorney, for the Commonwealth.

*Harvey Brower* for the defendant.

QUIRICO, J. The defendant was convicted by a jury of murder in the second degree for killing Ronald Fregeau in Lawrence on December 3, 1973. His appeal is before us under the provisions of G. L. c. 278, §§ 33A-33H. The case presents for our decision these issues:[1] (1) whether the trial judge impermissibly limited cross-examination of a prosecution witness, (2) whether the judge should have declared a mistrial when defense counsel learned that the prosecution had arguably suppressed allegedly exculpatory information, (3) whether the judge correctly instructed the jury on the meaning of proof beyond a reasonable doubt, and (4) whether the judge erred in instructing the jury that the prosecution need not prove that no one but the defendant could have committed the crime. There was no error.

The evidence against the defendant consisted primarily in the testimony of Roy Weisenborn and Robert Burns, each of whom was granted immunity in exchange for testifying. Burns testified as follows: On the evening of December 3, 1973, he was present with the defendant, Weisenborn, Nancy Emory, and another individual in Burns's or Weisenborn's apartment in Lawrence. Following some conversation, Weisenborn drove Burns, Emory, and the defendant in Emory's car to the Beacon Courts housing project in Lawrence where Fregeau lived. During the trip, Burns rode in the back seat, the defendant sat in the right front seat, and Emory sat in the front seat between the defendant and Weisenborn.

[1] Inasmuch as the defendant has not briefed other assignments of error and has not sought to raise other issues, we limit consideration to the points actually briefed. E.g., *Commonwealth* v. *Watkins,* 375 Mass. 472, 474 n.2 (1978).

On arrival at the housing project, the defendant said something to Emory about retrieving his clothes and identification from Fregeau's apartment. Emory left the car and returned about five minutes later. She said words to the effect that Fregeau wanted to cut the defendant's throat. After getting back into the car, Emory sat in the right front seat, and the defendant sat in the middle of the front seat.

Several minutes later, an individual appeared at the edge of the parking lot calling to the defendant to "come here." The defendant instructed Weisenborn to roll down the driver's side window and, when that was done, leaned across Weisenborn and fired "a couple" of shots. The person who had been standing at the edge of the parking lot fell down to his right.

After the shooting, all four occupants of the car drove to the home of Bradley Lyon in Pelham, New Hampshire, where they met Lyon and a young girl.

Weisenborn related essentially the same story as did Burns except for the following details. After Emory left the car at Beacon Courts, Weisenborn backed the car into a parking space. After the defendant fired one shot, the victim fell down. Weisenborn then allowed the car to roll forward a bit. The defendant asked Weisenborn to wait, said, "Dead men tell no tales," and fired a second shot. Weisenborn did not, however, recall rolling down the window.

In addition to the eyewitness testimony of Burns and Weisenborn, the Commonwealth presented testimony tending to show the following. A Lawrence police officer, who was on foot patrol in the Beacon Courts housing project area, heard three gunshots at about 10:30 P.M. He arrived in the Toye Avenue parking lot, which abutted Fregeau's building, a few minutes later and discovered a man, later identified as Fregeau, lying on his back and bleeding profusely from the head. Fregeau was taken to Lawrence General Hospital, where he died on December

4, 1973, from a bullet wound to his brain. An autopsy by the medical examiner disclosed a grazing bullet wound to the scalp and a second, penetrating wound caused by a .22 caliber bullet that entered, and was recovered from, the skull. Both bullets entered the victim in the area of the right temple. On December 7, police obtained a .22 caliber revolver from underneath the defendant, who was lying on a bed when awakened by the police in Emory's apartment. Ballistic examination of this revolver was unable to establish whether it had fired the bullet removed from Fregeau's skull.

Several witnesses furnished corroborating details. See G. L. c. 233, § 20I. One resident of Beacon Courts saw the victim, whom she knew personally, leave a nearby convenience store at about 9:40 P.M. On her way home, she observed a station wagon with three occupants in the front seat. At some later time, she observed the defendant in the rear seat of the same car. Thereafter, she heard two gunshots. A second resident observed a car with lighted headlamps backed into a parking space. She later heard two or three sounds like firecrackers and, after thirty or forty seconds, observed a light colored station wagon with three occupants in the front seat drive past her leaving the housing project area. Police officers searched Fregeau's apartment in Beacon Courts after the incident and discovered several identification cards bearing the defendant's name and a shirt labelled with the defendant's first name, which differed from that of the victim. Lyon and a young girl (housekeeper) living with Lyon in Pelham, New Hampshire, recalled being visited one night in December by Emory, Weisenborn, Burns, and the defendant, and they stated that this visit was the only time the defendant came to their house. Several witnesses had seen the defendant display a revolver similar to the one confiscated by the police on December 7. When he was arrested for murder at the Lawrence District Court on December 8,[2] the defendant initially denied knowing Fre-

---

[2] The defendant was in the holding cell at the court house, presuma-

geau. He then admitted knowing Fregeau and having his clothes at Fregeau's apartment. The defendant further asked the arresting officer to shoot him, inasmuch as he was "a waste" and would "never spend [his] life in jail."

The defendant introduced no evidence. Defense counsel relied instead on several inconsistencies in the Commonwealth's evidence. We summarize the most significant of these. We have already noted that one witness definitely placed the defendant in the *rear* seat of the car. Two witnesses said they heard three shots in rapid succession; because the defendant's revolver was a single-action weapon, requiring that the hammer be cocked before each firing, three quick shots would be impossible to fire. Lyon said he was getting ready for bed when the defendant's party arrived, that he was not working that night, and that the party must therefore have arrived after 10 P.M.; it was stipulated, however, that December 3, 1973, was a Monday, and Lyon's housekeeper testified that Lyon would normally have worked that night beginning after midnight and would therefore not have gone to bed.

The jury evidently concluded that these inconsistencies did not create a reasonable doubt about the defendant's guilt,[3] and they convicted him of murder in the second degree.

1. *Limitation of cross-examination.* The defendant argues that the judge improperly limited cross-examination of the prosecution witness Robert Burns. Defense

bly awaiting arraignment on a charge of illegally possessing the revolver taken from him the previous day.

[3] We note, for example, the following possible evaluations of the evidence. Weisenborn's account is admirably consistent with the pathological findings if one assumes that the first bullet, fired while the victim was presumably facing the car, grazed the victim's head and that the second bullet, fired after the victim had fallen to his right and onto his back, entered the skull. Discrepant memories about the number of shots fired could have been explained by the lapse of time. The inconsistency in Lyon's testimony is not great in light of his own testimony that he sometimes took naps before going to work and would not have left strangers in the house while he went to work.

counsel elicited on cross-examination the information that, in exchange for Burns's testimony, the Commonwealth had granted Burns immunity and dropped a number of unrelated bad-check charges. Counsel was not permitted, however, to inquire, "Where did you get those checks that you cashed?" In addition, counsel established that Burns was under the influence of an amphetamine-like drug at the time of the incident, but was not allowed to ask, "How long had you been using drugs up to that point?" or whether Burns entered a drug rehabilitation center at a later time.

Counsel unquestionably had, and was granted, the right to test Burns's ability to perceive and remember by inquiring whether Burns had been using drugs near the time of the crime. See *Commonwealth* v. *Barber*, 261 Mass. 281, 290 (1927). Counsel had no right, however, to inquire further to establish a pattern of drug addiction or treatment without also showing how that specific information would affect Burns's credibility. *Commonwealth* v. *LaCorte*, 373 Mass. 700, 706 (1977). *Commonwealth* v. *Caine*, 366 Mass. 366, 369-370 (1974). *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 231, cert. denied, 389 U.S. 916 (1967). *People* v. *Ortega*, 2 Cal. App. 3d 884, 902 (1969). *State* v. *Belote*, 213 Kan. 291, 296 (1973). *State* v. *Cedre*, 314 A.2d 790, 798-799 (Me. 1974). But see *People* v. *Freeland*, 36 N.Y.2d 518, 525 (1975) (evidence of heroin addiction admissible to impeach crucial identification by stranger). See generally Annot., 65 A.L.R.3d 705 (1975). The judge therefore properly excluded the questions.

With respect to the excluded question about where Burns obtained the bad checks, counsel argues that he sought to establish a connection between Burns and the victim and a motive for Burns to commit the crime. The colloquy between counsel and the judge clearly shows, however, that the judge excluded only the specific question about "where" the checks came from while preserving counsel's right to explore Burns's motive. Counsel could easily have asked whether Burns and Fregeau were

involved together in the check scheme, but he apparently chose not to. In these circumstances, there was no abuse of the judge's discretion to limit cross-examination on collateral matters. See, e.g., *Commonwealth* v. *Underwood*, 358 Mass. 506, 513 (1970).

2. *Alleged suppression of exculpatory evidence.* During cross-examination of Lyon, defense counsel learned for the first time that Lyon had no independent memory of the date on which the defendant and his companions had visited Lyon's home in Pelham, New Hampshire. The judge struck Lyon's testimony about the date and instructed the jury that the remainder of his testimony had no probative value. The defendant argues here, as he did below, that the prosecution had previously been aware of Lyon's lack of memory about the date, had withheld that information despite a general request to produce exculpatory evidence, and had thereby denied the defendant a fair trial in contravention of *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). For reasons we feel obligated to explain at length, we disagree.

As originally articulated by the Supreme Court, the *Brady* rule is that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* Accord, *Moore* v. *Illinois*, 408 U.S. 786, 794 (1972). To establish a *Brady* violation, a defendant must show that evidence actually existed (*Commonwealth* v. *Adams*, 374 Mass. 722, 732 [1978]) tending to exculpate him (*Commonwealth* v. *Pisa*, 372 Mass. 590, 595-596, cert. denied, 434 U.S. 869 [1977]) and that the prosecution failed to disclose it on proper request (*Commonwealth* v. *Gilday*, 367 Mass. 474, 487 [1975]). The defendant has not made the required showing on this record.

With respect to existence, counsel learned that Lyon had been interrogated by the prosecutor and police detectives during April of 1974, that someone made written

notes of the questioning, and that Lyon did not then remember the date of the visit to his home. We may assume without deciding that these notes were an appropriate subject for a *Brady* production request. Cf. *Commonwealth* v. *Lewinski*, 367 Mass. 889, 902 (1975) (defining "written statements" for purpose of State-law-based discovery motion). Lyon never indicated, however, that he made his lack of memory known to the police or that, if he did, the police recorded the fact. *Brady* imposes no obligation on the prosecutor to give discovery of every aspect of his case. *Weatherford* v. *Bursey*, 429 U.S. 545, 559-561 (1977). Thus, unless the police notes actually recorded Lyon's lack of memory, there was no exculpatory information for the prosecutor to provide.

Even assuming that some evidence existed that might have been disclosed, that evidence was not sufficiently material to the defendant's innocence to fall within the *Brady* rule. The defendant made no specific request for disclosure of Lyon's statements or for information bearing on the date of the visit to Lyon's home. In this circumstance, *Brady* would be implicated only if, considering the record as a whole, the evidence withheld would create "a reasonable doubt that did not otherwise exist." *United States* v. *Agurs*, 427 U.S. 97, 112 (1976). Lyon's testimony served only to corroborate the testimony of Burns and Weisenborn on an issue quite tangential to whether the defendant fired the fatal shot—namely, whether the defendant fled the scene. This case is, therefore, a far cry from *Commonwealth* v. *Ellison, ante* 1, 18-20 (1978), where the evidence withheld directly concerned the defendant's participation in the crimes. Moreover, the jury were told both by Lyon (when he was later recalled by the Commonwealth) and by Lyon's housekeeper that the defendant visited the house only once, and then in company with Emory, Burns and Weisenborn. Thus, Lyon's lack of memory about the date could not have significantly diminished the value of his testimony to the Commonwealth's case. In particular, the fact of poor memory

would not have created a reasonable doubt as to the defendant's guilt.

There is yet a further reason why reversal would be unwarranted. The information allegedly suppressed by the prosecutor surfaced during the trial, and counsel made dramatic and effective use of it. In the absence of prejudice to the defendant, there was no error in allowing the trial to continue. E.g., *United States* v. *Colyer,* 571 F.2d 941, 948 (5th Cir. 1978); *United States* v. *Kaplan,* 554 F.2d 577, 580 (3d Cir. 1977) (collecting cases); *Commonwealth* v. *DeChristoforo,* 371 Mass. 26, 36-37 (1976). The test of the timeliness of a prosecution disclosure is whether the defendant was able to make effective use of the evidence in preparing and presenting his case. *United States* v. *Pollack,* 534 F.2d 964, 973 (D.C. Cir.), cert. denied, 429 U.S. 924 (1976). As the evidence involved here went primarily to Lyon's credibility, we hold that ultimate and effective presentation of the evidence to the jury cured any error that might otherwise have existed. See *Commonwealth* v. *Dabrieo,* 370 Mass. 728, 743-744 (1976). Cf., e.g., *United States* v. *Agurs, supra* at 104 & n.10 (*Brady* concerned primarily with validity of truth-finding process, not with prosecutorial misconduct).

Because the defendant waived his motion to produce written statements by witnesses at the hearing thereon, we need not consider whether our decision in *Commonwealth* v. *Lewinski, supra,* required the judge to declare a mistrial.

3. *Charge concerning reasonable doubt.* The defendant excepted to portions of the judge's charge concerning proof beyond a reasonable doubt. We have examined the charge and find that, although the charge is not one we would endorse as a model, it was adequate. It contains the traditional definition in terms of "moral certainty." See *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850). At least in the absence of trivializing analogies to daily life, the charge is not objectionable merely for containing explanations of what is not a reasonable doubt. *Common-*

*wealth* v. *Seay, ante* 735, 745-746 (1978). Cf. *Commonwealth* v. *Ferreira,* 373 Mass. 116, 129-130 (1977).

4. *Charge concerning burden of proof.* In one portion of his charge to the jury, the judge stated twice that "the Commonwealth [need not] prove that a criminal act could not have been done by anybody else other than the Defendant or to prove that no other person than the Defendant had an opportunity to do it." In his brief, the defendant devotes three sentences and one inapposite citation to arguing that the giving of this instruction was reversible error. It is difficult to construe this treatment as appellate argument requiring our consideration. See *Commonwealth* v. *White,* 358 Mass. 488, 492 (1970); *Commonwealth* v. *Belton,* 352 Mass. 263, 270 (1967); S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1974). We note, however, that the instruction states a correct rule of law. *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 55-56 (1975). *Commonwealth* v. *Medeiros,* 354 Mass. 193, 197 (1968) (citing cases), cert. denied sub nom. *Bernier* v. *Massachusetts,* 393 U.S. 1058 (1969). *Commonwealth* v. *Swartz,* 343 Mass. 709, 711 (1962) (citing cases). Indeed, the judge's instruction was nearly an exact quotation from *Commonwealth* v. *Leach,* 160 Mass. 542, 551 (1894), where we first clearly stated the principle. It was not necessary, as the defendant seems to argue, for the judge to explain in addition the obvious point that the possibility of another perpetrator might create a reasonable doubt.

5. Pursuant to our duties under G. L. c. 278, § 33E, we have examined the entire record and are satisfied that there was no miscarriage of justice. Accordingly, the conviction is affirmed.

*So ordered.*