COMMONWEALTH vs. JOHN CAMPBELL, JR.
(and two companion cases[1]).

Norfolk.   February 6, 1979. — August 7, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Jury and Jurors. Constitutional Law*, Jury. *Practice, Criminal*, Empanelling of jury, Examination of jurors, Location of defendant in court room, Access to witnesses, Discovery, Argument by prosecutor, View, Instructions to jury. *Evidence*, Expert opinion, Photographs.

At the trial of three defendants charged with murder in the first degree, evidence, together with reasonable inferences therefrom, was sufficient to warrant the denial of each defendant's motion for a directed verdict. [685-690]

The record of a criminal case, which showed only that ten of sixteen persons called in a special venire were retired, did not support the defendants' contention that they had been denied their rights under the Sixth Amendment to the United States Constitution because of a systematic exclusion of young persons. [690-693]

An informal procedure used by a court officer to summon additional jurors when the regular venire was exhausted, by which the officer chose names from past jury lists and made about eighty telephone calls, was not illegal in the absence of prejudice to the defendants. [693-695]

The judge at a criminal trial was not required to question each prospective juror individually. [695-696]

The judge at a criminal trial did not abuse his discretion in denying a defendant's request to be seated at the counsel table. [697-698]

Where defense counsel in a criminal case was given an opportunity to interview a prospective prosecution witness who was a prisoner and the witness refused to be interviewed, the defendant was not deprived of his right of access to witnesses in the Commonwealth's custody by the fact that the interview was to take place in a detention room at the court house with a correction officer stationed

_____
[1] One against Stephen J. Doherty and one against Arthur Keigney.

outside the open door of the room, nor by the fact that the judge denied a motion to bring the witness into court to inform him of his right to consult with defense counsel. [698-700]

Where, in response to various motions for discovery of certain documents, defense counsel at a criminal trial were given a transcript of a police interview of a prosecution witness which had been edited by the prosecution without review by the judge, and where the judge refused to order certain other documents turned over to the defendants and refused to read them himself to determine their relevance or to identify and preserve them for purposes of appeal, this court affirmed the convictions without prejudice to the right of the defendants to seek further relief by motions for new trials on the ground that the denial of their requests for access to the various documents deprived them of fair trials. [700-703]

At the trial of three inmates of a correctional institution charged with the murder of another inmate, the prosecutor's comments in his closing argument which suggested that certain defense witnesses who were also prisoners were presenting a "united inmate front" were not improper. [703-704]

At a murder trial, the judge did not err in allowing an expert witness to testify as to the time of the victim's death. [704]

At a murder trial, the judge did not abuse his discretion in denying the defendant's motions for a jury view. [704-705]

At a murder trial, the judge did not abuse his discretion in admitting in evidence color photographs of the victim's body. [705]

INDICTMENTS found and returned in the Superior Court on February 3, 1977.

The cases were tried before *Keating, J.*

*Usher A. Moren* for Arthur Keigney.

*Alan P. Caplan* for Stephen J. Doherty.

*Alfred E. Nugent* for John Campbell, Jr.

*Charles J. Hely*, Assistant District Attorney, for the Commonwealth.

QUIRICO, J. Robert A. Perrotta was brutally murdered in his cell at the Massachusetts Correctional Institution (MCI) at Walpole on November 25, 1976. The defendants John Campbell, Jr., Stephen Doherty, and Arthur Keigney, who were all inmates at MCI Walpole on that date, were indicted, tried, and convicted of murder in the first degree as a result of this incident. Each was sentenced to "imprisonment in the state prison for life." See G. L.

c. 265, §§ 1-2. Their appeals are before us under the pro-
visions of G. L. c. 278, §§ 33A-33G, and raise a variety of
issues.[2] We affirm the judgments.

The evidence against the defendants consisted primar-
ily of the testimony of Thomas Carden, a close friend and
one-time brother-in-law of the victim. Carden testified as
follows. On November 25, 1976, Carden, Perrotta, and the
three defendants were inmates in Block A-2 at MCI Wal-
pole. Carden lived in cell 40, which was the third cell on
the left-hand side of the second tier. Perrotta occupied
cell 62, which was the second cell on the left-hand side of
the third tier.[3] At about noon on November 25, Carden
and Perrotta ate Thanksgiving dinner together. Perrotta
finished his own meal and made sandwiches from anoth-
er inmate's meal. He carried these sandwiches out of the
dining hall wrapped in napkins and concealed beneath
his bathrobe or his coat.

Perrotta was present in Carden's cell from approxi-
mately 3:30 P.M. to 4:45 P.M. Neither inmate went to the
evening meal. About 4:45 P.M., Perrotta left Carden's cell
in response to a call by someone. A few minutes later,
Perrotta returned in a visibly distressed state. After some
conversation, Perrotta left Carden's cell again. Carden
consulted his watch and, two minutes later, left the cell.
He "hung around" on the landing of the rear stairway for
about one minute and then walked up to the third tier
landing.

Carden met the defendant Doherty on the third tier
landing. Doherty put his hand on Carden's shoulder and

---

[2] Errors assigned but not briefed are deemed waived. *Common-
wealth* v. *Adrey*, 376 Mass. 747, 748 n.1 (1978). *Commonwealth* v.
*Horton*, 376 Mass. 380, 387-388 (1978). S.J.C. Rule 1:13, as amended,
366 Mass. 853 (1974).

[3] The cells were counted from the front of the block in Carden's
description. Testimony from correction officials explained that cat-
walks ran around the cellblock at the second and third tier levels.
Stairways were located at the front and rear of the block on the
right-hand side.

talked in a loud voice about selling some marihuana to Carden. He prevented Carden from moving along the catwalk to get to Perrotta's cell. After an interval, the door to Perrotta's cell opened, and Perrotta, Keigney, and Campbell walked out. Doherty thereupon stopped talking to Carden and allowed him to proceed to Perrotta's cell. Carden leaned against the rail and had a brief conversation with Perrotta, during which Perrotta appeared "very nervous." Shortly afterward, a guard announced the 5 P.M. lockup and count, and Carden went back down to his own cell.

When the lockup ended at 6 P.M., Carden immediately went upstairs to Perrotta's cell. He observed Perrotta lying on the bed wearing headphones. About forty-five minutes later, Carden returned to Perrotta's cell and knocked on the door. Perrotta released an interior locking mechanism and invited Carden into the cell.[4] After ten minutes, Carden left the cell with two bags of marihuana in order to place a football bet in a neighboring cellblock. En route, Carden stopped briefly in the cell occupied by Thomas McInerney on the right-hand side of the third tier.

While Carden was out of Block A-2 placing the bet, a visitor was announced for Perrotta. On hearing a second announcement of Perrotta's visitor, Carden returned to Block A-2. As he entered the block, he observed Doherty leaning over the rail in front of Perrotta's cell. He proceeded up the front stairway. When he reached the second tier, he saw Doherty walking along the third-tier catwalk toward the rear of the cellblock and Keigney and Campbell leaving Perrotta's cell at a fast pace. No one else was present on the catwalk. Carden then proceeded up to Perrotta's cell and, at about 7:30 P.M., discovered Perrotta's body.

---

[4] Perrotta's door was locked from the inside with an illegal device called a "door peg." Carden had previously supplied the device to Perrotta and described it as "one of the better types." It could be released from outside the cell only with a tool and some patience.

Peter McGuire was the correction officer in charge of Block A-2 during the evening of November 25. While locking Perrotta into the cell during the 5 P.M. count, McGuire "saw flesh,"[5] and thereby assured himself that Perrotta was present. Based on the log he kept that night, McGuire testified that Carden left the block at 6:10 P.M., returning at 6:25 P.M., and left again at 7:18 P.M. At 7:20 P.M., McGuire was notified that Perrotta had a visitor. He shouted Perrotta's name but received no response. At 7:30 P.M., McGuire repeated the visitor announcement. An inmate, whom McGuire was unable to identify, was walking along the third tier at this time. This inmate looked into Perrotta's cell and told McGuire that Perrotta was not there. McGuire then telephoned other blocks to have the visitor announcement repeated there. Shortly thereafter, Carden entered Block A-2 in apparent haste, and, looking up to the third tier and ignoring McGuire, he went up to Perrotta's cell. Carden then called for a stretcher.

Dennis Spicer, a prison medic, was summoned to Perrotta's cell at about 7:40 P.M. Perrotta displayed no signs of life, but his skin was warm and normal in color. There was a bright drop of blood on the pillow, but no blood on the bed. Dr. Harold Shenker, a medical examiner, arrived in Perrotta's cell at about 9 P.M. Based on his own observations and those made by Spicer, Dr. Shenker determined that Perrotta had died within two hours preceding 9 P.M. Dr. George Katsas performed an autopsy on Perrotta's body at 4:15 P.M. on November 26. His examination disclosed several bruises and two bathrobe cords tied tightly about the neck. The victim's penis had been torn · from his body and inserted into his mouth; this dismemberment had been done, in Dr. Katsas's opinion, while

---

[5] McGuire explained that, as part of his routine, he would make sure that some part of an inmate's skin was in sight in order to preclude the possibility of an inmate's leaving clothing in the bed while he was elsewhere.

Perrotta was alive. The stomach contained undigested chicken or turkey together with other food; the food had been in Perrotta's stomach for at most two hours preceding death. Dr. Katsas estimated the time of death as "shortly before" Spicer's observations and two to four hours before Dr. Shenker's, and he concluded that death had resulted from strangulation.

The defense evidence consisted solely of testimony aimed at contradicting subsidiary details in Carden's story and at otherwise discrediting Carden. Thomas McInerney was acquainted with Perrotta and Carden. He testified that Perrotta was rising from the Thanksgiving dinner table with a half-full tray when he arrived, that Perrotta was wearing dungarees and a T-shirt, and that he did not observe Perrotta make sandwiches or see any bulges in Perrotta's clothing. McInerney also described a conversation at Bridgewater in which Carden asked McInerney to say he "saw something" on November 25 and suggested, "If you back me up, you might even be able to hit the street behind this." McInerney stated that Carden had not visited his cell around 7 P.M.

One Ronald MacDonald testified to observing an argument between Carden and Perrotta within the week preceding the murder in which Carden expressed dissatisfaction with the way Perrotta was treating Carden's sister (formerly Perrotta's wife) and her children. Carden denied ever arguing with Perrotta about family matters. One Robert Guzowski stated that at some time no later than April of 1977, Carden told him at the Salem house of correction that "when he got through with his trials and his cases, he was going to get away from here and go to Arizona." Carden denied mentioning a trip to Arizona during the pendency of the case.

1. *Motions for directed verdicts.* At the close of the Commonwealth's case in chief, and again after the summations,[6] each defendant moved for a directed verdict. Fol-

---

[6] The timing of the motions was unusual in that they are normally

lowing argument, the judge denied the motions subject to the defendants' exceptions. In reviewing the denial of a motion for a directed verdict in a criminal case, we determine whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged. *Commonwealth* v. *Latimore, ante* 671, 676-677 (1979). See *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979); *Commonwealth* v. *Clark, ante* 392, 403-404 (1979), and cases cited. Under this standard there was no error in denying the motions for directed verdicts.

General Laws c. 265, § 1, provides: "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree. . . . The degree of murder shall be found by the jury."

Speaking in general terms, we have defined the term "murder" used in this statute to mean the unlawful killing of a human being by another human being with malice aforethought. *Commonwealth* v. *Campbell,* 375 Mass. 308, 312 (1978). *Commonwealth* v. *Caine,* 366 Mass. 366, 373 (1974). *Commonwealth* v. *McCauley,* 355 Mass. 554, 559 (1969). The indivisible phrase of art "malice aforethought" describes the particular mental state accompanying a homicide which makes the act murder and, in so far as is relevant to this case, encompasses the intent to inflict great bodily harm and the intent to kill. E.g., *Com-*

made at the close of the Commonwealth's evidence and again before, rather than after, the closing arguments. See Rule 70 of the Rules of the Superior Court (1974); Mass. R. Crim. P. 25 (b)(1) *post* 896 (effective July 1, 1979). Inasmuch as no argument is made by the Commonwealth that these motions were not timely made, we do not consider whether the judge was obligated to entertain them.

monwealth v. Hebert, 373 Mass. 535, 539 (1977); Common-
wealth v. Mangum, 357 Mass. 76, 85 (1970). See generally
R. Perkins, Criminal Law 30-40 (1957).

A killing is premeditated if the "resolution to kill was
a product of cool reflection." Commonwealth v. Blaikie,
375 Mass. 601, 605 (1978). "[N]o particular length of time
is required in order for deliberate premeditation to be
found." Commonwealth v. Caine, supra at 374.

The use of extreme atrocity or cruelty, a second basis
for finding the defendants guilty of murder in the first
degree in this case,[7] was recently described in the follow-
ing words: "This issue must be left largely to the jury. . . .
There is no requirement that the defendant know that his
act was extremely atrocious or cruel, and no requirement
of deliberate premeditation. . . . A murder may be com-
mitted with extreme atrocity or cruelty even though
death results from a single blow. . . . Indifference to the
victim's pain, as well as actual knowledge of it and taking
pleasure in it, is cruelty; and extreme cruelty is only a
higher degree of cruelty" (citations omitted). Common-
wealth v. Golston, 373 Mass. 249, 260 (1977), cert. denied,
434 U.S. 1039 (1978).

Applying these definitions, it is apparent that there
was a case for the jury on the issue of murder in the first
degree. The evidence tended to show that Perrotta died of
strangulation following brutal dismemberment. The jury
could infer that the wounds were not self-inflicted; that
they were inflicted intentionally, with at least the pur-
pose of causing grievous bodily harm to Perrotta; and
that the use of two ligatures implied that the killing had
been deliberately premeditated. The amputation of Per-
rotta's penis while he was yet alive could be found to have
been extremely atrocious and cruel.

---

[7] There was no evidence that the killing in this case occurred during
the commission or attempted commission of a felony so as to make the
definition of felony murder relevant.

All the defendants argue, however, that the circumstantial evidence linking them with the crime was insufficient to warrant submitting the case to the jury. Doherty argues in addition that there was insufficient evidence concerning his own state of mind to allow the jury to consider his guilt as a joint entrepreneur. We disagree.

The evidence against Keigney and Campbell, while somewhat thin, was sufficient to warrant submitting the case to the jury. Both defendants were seen leaving Perrotta's cell at about the time when the 5 P.M. lockup was announced and again at about the time when, according to one view of the medical evidence, the victim was slain. See *Commonwealth* v. *Robertson*, 357 Mass. 559, 562-563 (1970). The jury could properly infer that the presence of Keigney and Campbell in Perrotta's cell was not for any normal purpose. See *Commonwealth* v. *Belton*, 352 Mass. 263, 266-267, cert. denied, 389 U.S. 872 (1967). Perrotta was nervous after the first of these visits to his cell and he was found dead after the second. Moreover, the evidence that Keigney and Campbell failed to alert guards to Perrotta's condition permits an inference that they were not mere passersby who happened on the scene innocently. See *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445-446 (1933). In cumulation, the various items of evidence and permissible inferences therefrom were sufficient to warrant the submission of the cases to the jury as against Keigney and Campbell.[8]

Although a somewhat closer question is presented with respect to Doherty, we believe that the evidence was also sufficient as to him. Carden testified that Doherty ob-

---

[8] It was, of course, unnecessary for the Commonwealth to prove a motive for the crime, *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 33 (1943), or to prove lack of opportunity by every other person, *Commonwealth* v. *Adrey*, 376 Mass. 747, 756 (1978), and cases cited. Similarly, it is of no particular moment that almost the entire evidence against the defendants came from one fellow inmate because questions of credibility are for the jury alone to resolve. *Commonwealth* v. *McCauley*, 355 Mass. 554, 560 (1969).

structed his passage to Perrotta's cell shortly before 5 P.M. by placing a hand on his shoulder and engaging in loud conversation. He further testified that Doherty abruptly ceased these activities when Keigney and Campbell emerged from Perrotta's cell. Carden also testified to seeing Doherty leaning over the rail in front of Perrotta's cell just before the body was discovered. The jury might reasonably infer that Doherty was acting as a lookout on both occasions. If they so found, they would be justified in concluding that at the time Keigney and Campbell were murdering Perrotta, Doherty was present near the scene, purposefully aiding and abetting them in the commission of the crime, and that by reason thereof he was guilty as a principal. G. L. c. 274, § 2. See, e.g., *Commonwealth* v. *Knapp*, 9 Pick. 496, 518 (1830). Cf. *Commonwealth* v. *Perry*, 357 Mass. 149, 151-152 (1970).

The defendants make two arguments in support of their contention that verdicts should have been directed in their favor. First, they assert that evidence of mere presence at the scene of a crime is insufficient to support a conviction. See *Commonwealth* v. *Clark*, 363 Mass. 467, 473 (1973), and cases cited. As to Doherty, application of *Clark* and similar cases is inappropriate in light of evidence permitting an inference of his actual participation in the crime as an aider and abettor. *Commonwealth* v. *Michel*, 367 Mass. 454, 456-459 (1975). *Commonwealth* v. *Conroy*, 333 Mass. 751, 754-755 (1956). The reliance placed on this argument by Keigney and Campbell is also misplaced in light of the evidence tending to show their commission of the crime. Second, the defendants argue that, because several inferences were possible from the fact of their presence in the cell, a guilty verdict would necessarily be based on conjecture or surmise. See, e.g., *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), and cases cited. The only inference inconsistent with guilt suggested by the defendants, however, is that they were mere happenstance visitors to Perrotta's cell. Their failure to take any action on discovering the body weakens

this inference. Although the inference suggested by the defendants is conceivable, "[i]t is sufficient that the evidence permitted the inference which the jury obviously drew against [the defendants]." *Commonwealth* v. *Nelson*, 370 Mass. 192, 203 (1976).

We hold that the judge correctly denied the motions of all three defendants for directed verdicts of not guilty.

2. *Selection of additional venire.* During the first day of trial, eleven jurors were empanelled and the available venire was completely exhausted. The judge orally ordered fifty jurors to be brought in the next day.[9] Court officers chose names from past jury lists and made about eighty telephone calls, with the result that sixteen additional jurors appeared in court on the second day. Of the sixteen, ten listed themselves as retired, four as "housewife" or "at home," and two as employed. On seeing the list, counsel for the defendants challenged the array as not fairly representative of the community. After the judge denied these motions, counsel requested an opportunity to interrogate the responsible court officer under oath or during a recess. The judge denied these requests as well. Three jurors were eventually seated from the group of sixteen additional veniremen.[10]

The defendants assert that the procedure used to obtain the sixteen additional jurors violated their constitutional right to trial by a jury drawn from a cross-section of the community and their right to have the jurors summoned under a regular, statutory procedure. We address these contentions in the order we have stated them.

a. *Constitutional argument.* We accept, arguendo, the defendants' unsupported assertion that the ten "retired" persons in the venire were older than sixty-five and that

---

[9] The judge also issued a written order directing the sheriff to procure thirty persons "from the bystanders or from the County at large qualified and liable to be drawn as jurors."

[10] Two other jurors were seated on the second day from a group of seven taken from other court sessions.

six other persons were younger. For the purpose of this appeal, we also assume that the high proportion of elderly persons in the additional venire could not have arisen by chance alone.

The Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor* v. *Louisiana*, 419 U.S. 522, 528 (1975). For the defendants to prevail on their claim of denial of this right, they must establish two facts. First, they must demonstrate exclusion of a constitutionally significant class of persons. See *id.* at 531-533; *Duren* v. *Missouri*, 439 U.S. 357, 364 (1979); *United States* v. *Hawkins*, 566 F.2d 1006, 1014-1015 (5th Cir.), cert. denied, 439 U.S. 848 (1978). We may assume without deciding that persons under sixty-five, who were substantially underrepresented in the additional venire, possess characteristics sufficiently discrete to justify treating them as such a class.[11] See *United States* v. *Butera*, 420 F.2d 564, 570 (1st Cir. 1970); J. M. Van Dyke, Jury Selection Procedures 35-39 (1977). But see *Commonwealth* v. *Johnson*, 372 Mass. 185, 198 (1977); *Commonwealth* v. *Lussier*, 364 Mass. 414, 423-424 (1973); *United States* v. *Test*, 550 F.2d 577, 590-593 (10th Cir. 1976).

There exists, however, a second prerequisite to a successful Sixth Amendment challenge. In the *Taylor* case,

---

[11] We emphasize that the record is devoid of evidence to justify the conclusion that young persons either have or lack attitudes or abilities that differ from those of older persons in ways having constitutional significance. We acknowledge Mr. Justice Marshall's admonition that "[w]hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable ... [and to deprive] the jury of a perspective on human events that may have unsuspected importance ...." *Peters* v. *Kiff*, 407 U.S. 493, 503-504 (1972). The Supreme Court has never, however, held that age classifications in jury selection are constitutionally suspect. See *Hamling* v. *United States*, 418 U.S. 87, 137 (1974).

the Court emphasized that it imposed "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." 419 U.S. at 538. Rather, the Court held only that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not *systematically* exclude distinctive groups in the community and thereby fail to be reasonably representative thereof" (emphasis supplied). *Id.* Accord, *Duren* v. *Missouri, supra; Commonwealth* v. *Williams, ante* 217, 221 (1979). A finding of a systematic exclusion of young persons would be wholly unwarranted on the present record, which shows only the bare facts about one specific venire containing only sixteen persons. See *United States* v. *Whiting,* 538 F.2d 220, 222 (8th Cir. 1976).

We must, therefore, conclude that no Sixth Amendment violation was made out. We are unable to determine from the record before us whether the evidence sought to be obtained by examining the court officer who supervised the summoning of the additional venire would have been relevant to the crucial question whether elderly persons were systematically overrepresented in Massachusetts venires. It is unnecessary for us to consider whether the judge's denial of an immediate opportunity to adduce such evidence was constitutional error. Cf. *Test* v. *United States,* 420 U.S. 28, 29 (1975) (error to deprive defendant of immediate access to master jury lists). This is because defense counsel could have interviewed the court officer at some other time during or after the court day on which the question was raised, and they could then have renewed their motion to quash based on the information gained thereby. It does not appear from the record that they attempted to do this. From all that does appear the judge merely exercised his discretionary control over the selection of jurors in declining to interrupt the empanelling process for an immediate voir dire or recess. Cf. *Commonwealth* v. *Amazeen,* 375 Mass. 73, 83 (1978); *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 51

n.3 (1975). There is no merit in the additional contention of Keigney and Campbell that their rights to confrontation were somehow infringed: the court officer was not a witness against them in any criminal proceeding.

The record now before us does not adequately raise the issue whether the procedure used to select the additional venire comported with the Massachusetts Constitution as interpreted in *Commonwealth* v. *Soares,* 377 Mass. 461 (1979). We therefore express no view concerning that issue. See *id.* at 493 n.38.

b. *Statutory argument.* The defendants also argue that the procedure used to summon the additional venire was statutorily irregular, and they ask us to reverse their convictions on that ground alone. The skeleton, but not the details, of the procedure to be followed when a venire is exhausted is set forth in G. L. c. 234, § 27: "If, by challenge or otherwise, a sufficient number of jurors duly drawn and summoned cannot be obtained for the trial of a case, the court shall cause jurors to be returned from the bystanders or from the county at large, to complete the panel, if there are on the jury not less than seven of the jurors who were originally drawn and summoned as before provided. The jurors from the bystanders shall be returned by the sheriff or his deputy or by a disinterested person appointed therefor by the court, and shall be such as are qualified and liable to be drawn as jurors." Although the precise nature of the defendants' argument is unclear, they appear to ask us to hold as a matter of statutory construction that the informal procedure adopted by the court officer for summoning "talesmen" under this statute, with its inherent capacity for discrimination and unauthorized exemption, was illegal. See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 792-795 (1977). We decline so to hold.

The use of talesmen to supplement ordinary jury pools is of great antiquity, dating in Massachusetts from St. 1699-1700, c. 1, § 4, and in England from St. 35 Hen. 8, c. 6, § 6 (1543). See generally 3 W. Blackstone, Commen-

taries 364-365 (Christian ed. 1807); 4 *id.* at 354-355. Although Parliament may have initially conceived that talesmen would be chosen at random from the crowd of bystanders, one of the few appellate decisions considering the allowable methods of selecting talesmen concluded that choosing names from the regular jury lists was permissible. *Rex* v. *Dolby,* 107 Eng. Rep. 322, 324-325 (K.B. 1823). The only Massachusetts case on point reached a similar conclusion. See *Commonwealth* v. *Sacco,* 255 Mass. 369, 416-418 (1926). In both cases, the courts focused their analysis on the absence of proved bad faith or demonstrable prejudice. 107 Eng. Rep. at 324. 255 Mass. at 417. In *Dolby,* the court also noted the desirability of allowing officials to exercise discretionary selectivity and thereby avoid random choice. 107 Eng. Rep. at 324.

The reasoning in *Dolby* and *Sacco* is incomplete by modern standards, for it encompasses only considerations akin to due process and ignores the values of representativeness and randomness now thought implicit in the right to jury trial. Cf. *Taylor* v. *Louisiana, supra* at 528. In the absence of proof that the Massachusetts jury system, including the occasional use of talesmen, operates generally to produce unrepresentative juries, however, fairness to an individual defendant remains as the only relevant criterion for measuring the selection process in a particular case. Fairness in turn depends on the absence of prejudice to the defendant.

The defendants have not shown that they were prejudiced by the manner in which talesmen were summoned. Cf. G. L. c. 234, § 32 (irregularity in jury selection not reversible error unless objecting party injured thereby or unless objection made before verdict); *Commonwealth* v. *McKay,* 363 Mass. 220, 222-223 (1973) (semble) (injury must be shown even if objection timely). We may conclude only that the court officer had the opportunity to pick and choose the talesmen. As *Dolby* and *Sacco* demonstrate, the use of substantial discretion in the summoning of talesmen has ample historic antecedents and cannot be

said to be inherently unfair. Moreover, the need for talesmen is presumably infrequent, and we are loath to set down inflexible constraints for what amounts to an emergency power to complete a jury. Accordingly, we hold that no reversible error has been demonstrated.

3. *Manner and content of voir dire.* The defendants challenge the method by which the judge interviewed prospective jurors. The method was as follows. The clerk would draw and announce the names of jurors selected from the jury pool until every seat in the jury box was full. The judge would then ask a number of questions to determine whether the jurors selected stood indifferent. A juror desiring to make an affirmative response would raise his or her hand and be heard by the judge at the end of the bench farthest from the jury. After excusing some jurors on the basis of their answers, the judge would direct the clerk to draw and call enough additional jurors to replace those previously excused. The question, answer, and end-of-bench conference cycle would then be repeated until the judge was satisfied with the jurors then filling the box. Thereupon, the Commonwealth would exercise its peremptory challenges, and the box-filling process would resume. When the judge and the Commonwealth were both content, the defendants would exercise their peremptory challenges. This process continued until sixteen jurors were finally seated. All during the process, jurors who were part of the jury pool but not yet selected sat in the back of the court room where they could hear the judge's questions. Indeed, the judge shortened his statement of the voir dire questions after the first time in reliance on what the jurors had already heard.

Prior to embarking on this method of conducting voir dire, the judge denied motions that each prospective juror be questioned individually. There was no abuse of discretion. *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 48-51 (1975), established that a judge may propound voir dire questions collectively. As we noted in *Commonwealth* v.

*Jackson*, 376 Mass. 790, 799 (1978), collective questioning does not necessarily inhibit truthful answers. And, as we held in *Montecalvo*, the deprivation of an opportunity for observing a prospective juror's demeanor lacks legal significance. 367 Mass. at 50.

The defendants nonetheless argue that individual voir dire was mandated by the second paragraph of G. L. c. 234, § 28, inserted by St. 1973, c. 919, and amended by St. 1975, c. 335. That paragraph provides: "For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination . . . shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

If we were to assume, without deciding, that questioning jurors at the end of the bench farthest from the jury box was not "outside the presence" of other prospective jurors, that assumption would avail the defendants nothing because they failed to show any substantial risk that their cases would be decided on extraneous considerations. In the circumstances of this case, when the principal evidence against the defendants came from a prison inmate, the prejudice, if any, by jurors against inmates as a class would be as likely to favor the defendants as to harm them. There was, therefore, no need for individual questioning.[12]

---

[12] Because there was no demonstrated risk of decision on extraneous

4. *Court room seating.* Before trial, Doherty's counsel asked that Doherty be permitted to sit at the counsel table in order to facilitate consultation as the trial progressed. The judge denied the request and ordered all defendants seated in the front spectator bench, some distance from the counsel table. In addition to asserting generally that the court room seating plan abridged the right to effective assistance of counsel, Doherty notes two incidents that, he says, prejudicially inconvenienced his defense.[13] We perceive no error.

We have repeatedly held that court room seating is a matter within the discretion of a trial judge. *Commonwealth* v. *Walker*, 370 Mass. 548, 573-574, cert. denied, 429 U.S. 943 (1976), and cases cited.[14] We have, moreover,

---

grounds, it was within the judge's discretion whether to ask additional questions beyond those mandated by G. L. c. 234, § 28, First. See *Commonwealth* v. *Horton*, 376 Mass. 380, 393 (1978), and cases cited.

[13] At one point during the voir dire of prospective jurors, the judge explained for the record "that counsel . . . is discussing the selection of jurors with the defendant." The second incident occurred during the direct examination of Officer McGuire and is reflected by the following colloquy between the judge and Doherty's lawyer:

THE JUDGE: "If you have any puzzlement, Mr. Caplan, I would appreciate it not being reflected on your face as you look at your client."

COUNSEL FOR THE DEFENDANT DOHERTY: "If your Honor please, I looked at my client, as I think I have a right to do, but I . . . ."

THE JUDGE: "I am interpreting your expression. I do not appreciate it."

[14] The United States Court of Appeals for the First Circuit has recently commented adversely on the Massachusetts practice of requiring prisoners to sit in a "dock." *Walker* v. *Butterworth*, 599 F.2d 1074, 1080-1081 (1st Cir. 1979), rev'g 457 F. Supp. 1233 (D. Mass. 1978). For the time being at least, the rule stated in the text may not apply to the prisoner's dock in a Massachusetts court room.

In this case, however, the defendants were seated in spectator seats rather than the dock. The "impression that [the defendants were] somehow different or dangerous" (*id.* at 1080) would not, we presume, be so great as to fall within the *Walker* rule. Clearly, the defendants must be seated somewhere if they are to be accorded their constitutional right to be present at their trial. Equally clearly, not every incident or circumstance which focuses the jury's attention on the fact that the defendants are the persons on trial can be considered to invade constitutional rights.

consistently rejected claims that separate seating impermissibly diminishes the effectiveness of counsel. *Commonwealth* v. *Bumpus*, 362 Mass. 672, 680 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974). *Guerin* v. *Commonwealth*, 339 Mass. 731, 734-735 (1959).

Doherty has not shown that communication at any particular juncture was both impossible and essential to securing a fair trial. We therefore see no reason to abandon our settled rule that seating is within a judge's discretion. The two incidents isolated by Doherty do not indicate that counsel was hampered in conferring with his client. They exemplify the judge's control over the conduct of the trial, but they do not, without more, show interference with the effectiveness of counsel. We are not persuaded that these particular comments by the judge prejudiced the defendant, and we therefore express no view concerning their propriety.

5. *The Carden interview.* During a recess, defense counsel sought to interview Thomas Carden before he took the stand. Carden was being held in custody in the basement of the court house. Counsel requested that others initially present in the detention room — including the district attorney, the court clerk, and two correction officers — leave, and this request was honored. Counsel also requested that the door be closed to ensure privacy. This request was denied on the ground that a correction officer had to keep Carden in view at all times. Carden declined to be interviewed. In a subsequent lobby conference, the judge denied motions to bring Carden before the court for the purpose of informing him of his right to consult with defense counsel if he so desired. The defendants now argue that the circumstances of the meeting between Carden and counsel, coupled with the judge's refusal to apply pressure from the bench, constituted prejudicial error.

Since the decision in *Commonwealth* v. *Balliro*, 349 Mass. 505 (1965), it has been the settled law of this Commonwealth that defense attorneys are entitled as of right to access to witnesses who are in the custody of the Commonwealth. *Id.* at 516-517. Accord, *Commonwealth* v. *Flynn*, 362 Mass. 455, 461 (1972); *Commonwealth* v. *Carita*, 356 Mass. 132, 142-143 (1969). The right encompasses only the opportunity for an interview, and a prosecution witness is free to talk with defense counsel or not, as he chooses. *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 223-224, cert. denied, 389 U.S. 916 (1967). Cf. *Commonwealth* v. *Carita*, *supra* (*Balliro* rule unsatisfied where prosecutor communicated witness's refusal). If an interview occurs, however, it should be "without the presence of the prosecutor or police officers." *Commonwealth* v. *Flynn, supra. Commonwealth* v. *Doherty*, 353 Mass. 197, 211 (1967), cert. denied, 390 U.S. 982 (1968). In addition, where there is a reasonable question whether or not the witness has voluntarily refused an interview, the preferable procedure is for the trial judge to inform him of the defendant's right to an interview and of his own right to refuse one, and to obtain his expression of consent or nonconsent on the record. *Commonwealth* v. *Carita, supra* at 143.

We have never held that every reluctant witness should be required to appear before the court for the purpose of expressing a demonstrably informed refusal to talk with defense counsel. Used as a matter of course, such a procedure would produce unwarranted delays in pending trials and would, in many cases, be likely to engender resentment or to overbear the witness's free choice. In a case such as *Commonwealth* v. *Carita, supra*, where counsel are unable to communicate directly with the witness to request an interview, formal record proceedings may be entirely appropriate. In a case such as this one, however, where access is arranged informally through the cooperation of the prosecutor, an equally informal expression of refusal by the witness is adequate.

Since Carden, the witness in question, was a prisoner serving a sentence, we discern no error in the positioning of a correction officer outside the open door to the detention room where the interview would take place. The record affords no basis for concluding that this security measure significantly deterred Carden from granting an interview. Security considerations practically demanded that a guard be nearby since Carden had, in fact, previously escaped from a Massachusetts house of correction.

In short, the circumstances of the Carden interview do not require reversal. The case of *Salemme* v. *Ristaino*, 587 F.2d 81 (1st Cir. 1978), offers no comfort to the defendants, for it requires a threshold showing of prejudice that our own cases do not require. Compare *id.* at 87-88, with *Commonwealth* v. *Balliro, supra* at 517. In any event, the defendants had made no constitutional argument relative to the Carden interview beyond merely citing *Salemme.* We therefore express no view on any Federal questions that may be implicated. See *Commonwealth* v. *Adrey*, 376 Mass. 747, 756 (1978); S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1974).

6. *Handling of discovery motions.* Before and during the trial, the defendants made a number of motions for discovery of certain documents. As a result of these motions, the defendants were furnished with unedited copies of Carden's testimony before the grand jury on two separate occasions and with the unedited copy of an interview between police officials and Carden on December 11, 1976. At the direction of the judge, the prosecution edited a transcript of an interview with Carden on December 1, 1976, and turned an edited copy over to the defense. Police Detective Lieutenant William Bergin, who conducted the initial investigation of the murder, prepared a report dated November 29, 1976, in which he described his initial investigation. When the existence of this report came to light during trial, the judge refused to order the Commonwealth to turn it over to the defendants, to read the report and determine its relevance, or to identify and

preserve the report for purposes of this appeal. Finally, the defendants at various times moved to inspect records concerning Carden and Perrotta that were maintained by correction officials. When the designated records were produced pursuant to a subpoena, the judge refused to allow defense counsel to inspect them, to read them himself to determine their relevance, or to identify and preserve them for purposes of this appeal.

We are confronted on this appeal with a situation where the record prevents us from performing meaningful review with respect to the withholding of these various documents from the defendants. Cf. *Commonwealth v. Pisa*, 372 Mass. 590, 598 n.6, cert. denied, 434 U.S. 869 (1977). The judge plainly had the responsibility to review and pass on the propriety of any editing of the record of the December 1 interview with Carden rather than to delegate that job entirely to the prosecutor. He further should have identified and preserved as part of the record on appeal the report prepared by Lieutenant Bergin and the records subpoenaed from the Department of Correction. See *Commonwealth v. Lewinski*, 367 Mass. 889, 903 (1975); Mass. R. Crim. P. 23 (c), *post* 893 (effective July 1, 1979). His failure to perform these judicial tasks leaves the case in a posture where we have nothing to review beyond his failure to act, but where there is no indication as to whether the judge's error was harmful. In these circumstances, although we affirm the convictions, we do so without prejudice to the right of the defendants to seek further relief by motions for new trials on the ground that the denial of their requests for access to the various documents deprived them of fair trials.

It may prove helpful for us to amplify the considerations which may become relevant in ruling on future motions for new trials in these cases. On motion of the district attorney, we impounded a copy of the report by Lieutenant Bergin and made it a part of the record. See *Commonwealth v. Lincoln*, 368 Mass. 281, 285 n.2 (1975). We have examined it and believe that defense counsel

ought to be shown a copy thereof for their own evaluation, particularly because it contains a description of how Lieutenant Bergin first learned the names of the defendants from Carden on the day following the murder. Cf. *Commonwealth* v. *Gilbert*, 377 Mass. 887, 892-894 (1979) (duty of prosecution to disclose certain oral statements of witnesses to avoid misleading defense). Arguing with the knowledge of how the report might have assisted their trial or preparation of the case, counsel may be able to persuade the judge that justice requires a new trial.

Somewhat different considerations appear relevant with respect to the institutional records subpoenaed from the Department of Correction. Our cases are very clear that a prosecutor has no duty to investigate every possible source of exculpatory information on behalf of the defendants and that his obligation to disclose exculpatory information is limited to that in the possession of the prosecutor or police. *Commonwealth* v. *Adrey*, 376 Mass. 747, 753-754 (1978). *Commonwealth* v. *Lewinski, supra* at 899-900. *Commonwealth* v. *Gilday*, 367 Mass. 474, 487-489 (1975). *Commonwealth* v. *Stone*, 366 Mass. 506, 510-511 (1974). Given the size of the government of this Commonwealth, it makes no practical sense to require the prosecutor to obtain and carefully comb the records concerning Carden and Perrotta in the remote hope of discovering something that might tend to exculpate the defendants. This is especially true when the defendants were themselves free to interview the officials having personal knowledge of the facts recorded in the documents sought to be inspected. Accordingly, we see no obligation for the *prosecutor* to obtain the institutional records for the purpose of turning them over to the defendants. The obligation, if any, of the Department of Correction to turn the records over to the defendants, even pursuant to a subpoena, presents a separate question, however, that the defendants may wish to explore on motions for new trials. General Laws c. 124, § 1 (j), c. 127, §§ 2, and 28-29, and c. 6, §§ 167-178, among others,

may be relevant in exploring this question. Beyond suggesting it, we intimate no view as to its correct resolution.

Finally, we believe that, in considering motions for new trials, the judge himself should review the unedited version of the Carden interview to determine, based on his experience in conducting the trial, whether relevant information was excised by the district attorney.

7. *The prosecutor's summation.* Near the end of his summation, the prosecutor discussed the credibility of the defense witnesses McInerney, MacDonald, and Guzowski. Concerning them, he said, "Well, those guys simply represent something that I asked you folks to make observations about at the outset as to why you think we have one prime witness and why we are so doggone fortunate to have even that one. Wasn't that a united inmate front, a united front of inmate society against you and you and everybody else in this state?" All defendants moved to strike this statement and requested an instruction that the jury disregard it, asserting that it was prejudicial and unsupported by evidence. The judge denied the motion.

In one aspect, the prosecutor's remark about "a united inmate front" can be understood purely as an attack on credibility. As such, it was clearly warranted by the conflicting evidence on collateral issues that concerned Carden's credibility — namely, arguments with Perrotta, the attempt to suborn McInerney's testimony, and the trip to Arizona. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 422-423 (1978), and cases cited. It was a reasonable inference from the evidence that the three inmates who testified for the defense had coordinated their testimony, and the prosecutor's restrained suggestion of this inference was not improper. Cf. *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 401 (1975) (characterizing testimony as "rankest perjury that will probably ever be heard in a courtroom" questionable but not reversible error).

In another aspect, the prosecutor's remark can be understood as an explanation and apology for the weakness of the Commonwealth's case. That is, the jury might have

been led to think that the fear of reprisal shared by inmates prevented the Commonwealth from producing more direct proof against the defendants. The tendency of the remark to induce such thought was beyond the evidence actually introduced, for there was no direct testimony suggesting the existence of such shared fear. The jury were entitled, however, to use their common sense on the question whether inmates are likely to come forward to accuse other inmates. See *Commonwealth* v. *Fitzgerald, supra* at 420; *Commonwealth* v. *McColl,* 375 Mass. 316, 323 (1978). Even in this second aspect, therefore, the prosecutor's remark cannot be considered improper.

8. *Time of death testimony.* Dr. Shenker's opinion as to the time of Perrotta's death was properly admitted. A witness's qualification to render an expert opinion is a question for resolution by the trial judge, whose conclusion will not lightly be overturned. *Commonwealth* v. *Haas,* 373 Mass. 545, 563 (1977), and cases cited. A medical opinion concerning time of death is not objectionable merely because it is not based on objective scientific tests. *Id.* at 563. *Commonwealth* v. *Russ,* 232 Mass. 58, 74-75 (1919). Thus, the failure of Dr. Shenker to employ a rectal thermometer went only to the weight of his testimony and not to its admissibility.[15] Finally, an expert may base an opinion in part on facts placed in evidence by other witnesses, and it is therefore no ground of objection that Dr. Shenker answered on the assumption that Spicer's observations were correct. See, e.g., *Commonwealth* v. *Gilbert,* 366 Mass. 18, 25 (1974); *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 438 (1974).

9. *Jury view.* There was no abuse of discretion in denying the defendants' motions for a jury view of cell-

---

[15] There was testimony that a human corpse loses heat at a rate of about one and one-half degrees an hour under certain conditions. Although a rectal thermometer would have provided some objective evidence concerning the time of death, there was testimony that the estimate thus derived would be merely one factor in arriving at a medical opinion.

block A-2. See *Commonwealth* v. *Curry*, 368 Mass. 195, 198 (1975), and cases cited; G. L. c. 234, § 35. Our review of the transcript persuades us that the jury were able to understand distances, angles, and physical layout from oral testimony given in conjunction with projected slides. See *Commonwealth* v. *Chance*, 174 Mass. 245, 247 (1899).

10. *Photographs of Perrotta.* The contention of Keigney and Campbell that the judge should have excluded color photographs of Perrotta's body is wholly without merit. The photographs were relevant on the question of extreme atrocity and cruelty. See *Commonwealth* v. *Bys*, 370 Mass. 350, 357-361 (1976). They accurately portrayed the appearance and location of the body as it was when Dr. Shenker observed it. Cf. *Commonwealth* v. *Allen*, 377 Mass. 647, 678-680 (1979) (questioning admission of photographs portraying post-mortem decomposition); *Commonwealth* v. *Richmond*, 371 Mass. 563, 565-566 (1976) (error to admit picture depicting horrible post-mortem injuries).

11. *Miscellaneous alleged errors.* We have considered all the other alleged errors argued by the defendants and conclude that they are not sufficiently meritorious to warrant extended discussion.

a. We see no error in declining to question prospective jurors about bias formed as a result of having previously been peremptorily challenged by one of the defense attorneys. There was no showing that any juror had been so challenged. In any event, all jurors were questioned generally about bias.

b. The mere showing that the Commonwealth interviewed a number of prison inmates does not, without more, create an obligation to tell the defense the results of the interviews or the names of inmates interviewed. See *Weatherford* v. *Bursey*, 429 U.S. 545, 559-561 (1977). There is no showing on this record that defense counsel attempted to learn from any other source the names of inmates present in MCI Walpole on the day of the killing or to interview any of them. The prosecutor had no obliga-

tion to act as an investigator for the defendants. These facts do not reach the point of implicating the rule of *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), requiring the prosecution to disclose evidence favorable to the defense on request. See *United States* v. *Agurs*, 427 U.S. 97, 112 (1976); *Commonwealth* v. *Adrey*, 376 Mass. 747, 753-754 (1978), and cases cited.

c. To the extent that the judge limited or restricted the cross-examination of Officers Carr and McGuire and inmate Carden, he acted within his discretion. See, e.g., *Commonwealth* v. *Adrey, supra* at 751-753. We think the issues sought to be explored — Perrotta's use of a door peg, the lighting conditions in the cellblock, and Carden's use of drugs — were already before the jury with sufficient clarity.

d. The claims of alleged errors in the judge's charge are based on the lifting of certain phrases and fragments of phrases from their context in the charge as a whole. We have repeatedly said that a charge must be construed as a whole and that, in consequence, isolated misstatements or omissions do not necessarily constitute reversible error. *Commonwealth* v. *Watkins*, 377 Mass. 385, 388 (1979). *Commonwealth* v. *Hicks*, 377 Mass. 1, 9-10 (1979). *Commonwealth* v. *Grace*, 376 Mass. 499, 500-501 (1978). None of the portions of the charge isolated by the defendants violates this test.

12. *Relief under G. L. c. 278, § 33E.* As required by G. L. c. 278, § 33E, we have carefully reviewed the entire record on the law and the evidence. We are persuaded that no miscarriage of justice occurred in this case. Accordingly, we grant no relief under § 33E.

13. *Conclusion.* The judgments are affirmed.

*So ordered.*