NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13386

CHRIS GRAHAM & others[1]  vs.  DISTRICT ATTORNEY FOR THE HAMPDEN DISTRICT.

Suffolk.     September 13, 2023. - January 23, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.[2]

District Attorney.  Police, Records, Prosecution of criminal cases.  Witness, Police officer, Impeachment.  Due Process of Law, Disclosure of evidence.  Evidence, Disclosure of evidence, Exculpatory, Police report, Impeachment of credibility.  Practice, Criminal, District attorney, Disclosure of evidence, Conduct of government agents.

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on April 6, 2021.

The case was reported by Wendlandt, J.

Matthew R. Segal (Rebecca A. Jacobstein, Committee for Public Counsel Services, & Jessica J. Lewis also present) for the plaintiffs.
Elizabeth N. Mulvey (Thomas M. Hoopes also present) for the defendant.

_____

[1] Jorge Lopez; Meredith Ryan; Kelly Auer; Committee for Public Counsel Services; and Hampden County Lawyers for Justice.

[2] Justice Cypher participated in the deliberation on this case prior to her retirement.

The following submitted briefs for amici curiae:

Jaba Tsitsuashvili, of the District of Columbia, Anya Bidwell, of Texas, & Jay Marshall Wolman for Institute for Justice.

Daniel S. Ruzumna & Eric Beinhorn, of New York, Joshua Tepfer, of Illinois, Kathrina Szymborski Wolfkot, of the District of Columbia, & Bharath Palle for Exoneration Project.

Vanessa Potkin, of New York, Stephanie Roberts Hartung, Adya Kumar, & Sharon L. Beckman for New England Innocence Project & others.

Luke Ryan for Massachusetts Association of Criminal Defense Lawyers.

Katharine Naples-Mitchell for Pioneer Valley Project & others.


GAZIANO, J.  In 2020, the United States Department of Justice (DOJ) conducted an investigation of the Springfield police department (department) and found that the department's officers, particularly those within the narcotics bureau, routinely falsified police reports and engaged in a "pattern or practice of excessive force."  These findings raised questions about the integrity of the evidence used by the office of the district attorney for the Hampden district (district attorney's office) to obtain convictions.  We are called on to determine whether the district attorney's office failed to comply with his obligations to disclose and investigate evidence of the department's misconduct.

The six plaintiffs -- two criminal defense organizations, two defense attorneys, and two former criminal defendants -- filed a petition with a single justice of this court, seeking global remedies for the alleged failures of the district

attorney's office, premised on the remedies provided in

Commonwealth v. Cotto, 471 Mass. 97 (2015), and Commonwealth v.

Ware, 471 Mass. 85 (2015).  The single justice appointed a

special master to make and report factual findings and

conclusions of law.  Ultimately, the single justice reserved and

reported the case to the full court.

The plaintiffs request that this court order the district

attorney's office to investigate the effect of the department's

misconduct on criminal prosecutions.  In the interim, the

plaintiffs request that this court institute a range of

remedies, including the creation of a list of officers in the

department who are connected to the misconduct, jury

instructions tailored to cases involving members of the former

narcotics bureau within the department, and a judicial

presumption favoring the admissibility of the DOJ report.  In

opposition, the district attorney's office claims to have

fulfilled its obligations to disclose and investigate the

department's misconduct, such that "everybody knows what

everybody knows.  There [are] no secrets in Springfield."

Further, the district attorney's office has provided evidence of

extensive efforts to obtain the materials reviewed by the DOJ

and disclose them to affected criminal defendants.

To remedy the troubling practices identified by the DOJ,

which affect the proper administration of justice in Hampden

County, we determine that the district attorney's office, through certain discovery policies, committed a breach of both the duty of the district attorney's office to disclose evidence that tends to exculpate defendants and the duty of the district attorney's office to investigate or inquire about such evidence. First, the practice of the district attorney's office of disclosing adverse credibility findings made about the department's officer witnesses only on a discretionary basis violates the duty of the district attorney's office to disclose. Second, the practice of the district attorney's office of withholding instances of officer misconduct from disclosure where a particular bad act cannot be attributed clearly to a particular officer violates the duty of the district attorney's office to disclose. Third, by failing to gain access to all documents known to have been reviewed by the DOJ, the district attorney's office failed in its duty to investigate. Accordingly, to remedy these breaches of the duties of the district attorney's office, we order the district attorney's office to obtain access to all categories of documents known to have been reviewed by the DOJ and disclose them to the plaintiffs. From there, case-by-case adjudication can begin to address the claims of individual defendants affected by the department's misconduct.

In so ordering, this court reemphasizes the importance of a prosecutor's dual duties -- to disclose and to investigate -- in upholding the integrity of our criminal justice system.  See Committee for Pub. Counsel Servs. v. Attorney Gen., 480 Mass. 700, 702-704 (2018).  It is the responsibility of prosecutors and defense attorneys alike to ensure that the due process rights of every criminal defendant in Hampden County are vindicated and protected.[3]

1.  Background.  a.  Parties.  Among the six plaintiffs are two legal organizations, the Committee for Public Counsel Services (CPCS) and Hampden County Lawyers for Justice (HCLJ).  CPCS is a Statewide entity established under G. L. c. 211D, and is responsible for providing representation to all indigent criminal defendants, whether directly through public counsel or indirectly through private, bar-appointed counsel.  HCLJ has approximately 150 attorney members, with four supervising attorneys.  HCLJ represents approximately seventy-five percent of indigent defendants in Hampden County.[4]

---

[3] We acknowledge the amicus briefs submitted by the Institute for Justice; the Exoneration Project; the New England Innocence Project, the Innocence Project, Inc., and the Boston College Innocence Program; the Massachusetts Association of Criminal Defense Lawyers; and the Pioneer Valley Project, Citizens for Juvenile Justice, and the Criminal Justice Institute at Harvard Law School.

[4] The two defense attorney plaintiffs are Meredith Ryan and Kelly Auer.  Both serve as bar advocates through HCLJ, and Ryan

The district attorney's office is the defendant in this action. The district attorney's office prosecutes cases in the Superior, District, and Juvenile Courts, with annual case filings ranging from approximately 20,000 in 2015 to over 15,000 in 2021.

Although the department is not a named party to this action, some background discussion of that department is warranted, given that the plaintiffs' claims necessarily implicate it. As of the time of the DOJ's investigation, the department had approximately 500 sworn officers, organized into three major divisions. The narcotics bureau, now disbanded, fell within the investigations division. It was a small unit of

_____

is a board member and vice-president of HCLJ. The two former defendant plaintiffs are Chris Graham and Jorge Lopez, both of whom allege that the district attorney's office wrongfully failed to disclose exculpatory material during their prosecutions.

The district attorney's office challenges whether the plaintiffs have standing. In her report, the special master found that, by virtue of their organizational functions, plaintiffs CPCS and HCLJ have proper representative standing for persons (including criminal defendants) whose rights are implicated by the issues underlying the petition. See Planned Parenthood League of Mass., Inc. v. Bell, 424 Mass. 573, 578, cert. denied, 522 U.S. 819 (1997). See also Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court, 484 Mass. 431, 447, S.C., 484 Mass. 1029 (2020) (organizations representing incarcerated individuals had representative standing to challenge their continued incarceration during COVID-19 pandemic). We agree. Given that CPCS and HCLJ have standing, we decline to reach the unnecessary question of standing with regard to the remaining four plaintiffs.

plainclothes officers focused on narcotics offenses.  At full capacity, the unit consisted of twenty-four officers, three sergeants, one lieutenant, and one captain.  The narcotics bureau was the focal point of the DOJ's investigation.

The department's internal investigations unit is charged with investigating allegations of misconduct made against both individual officers and the department itself.

b.  Facts.  This court draws its facts from the findings of the special master, as memorialized in her October 2022 report, supplemented by other undisputed facts in the record.  See S.J.C. Rule 2:13, as appearing in 382 Mass. 749 (1981).

i.  DOJ report.  In April 2018, the United States Attorney for the District of Massachusetts and the DOJ's civil rights division began investigating the narcotics bureau.

Three main incidents sparked the DOJ's investigation. First, a narcotics bureau sergeant was federally indicted for "threatening juveniles" in February 2016.  In a civil suit subsequently commenced by one of the juveniles against the city of Springfield (city) and the sergeant, the juvenile alleged that he suffered a broken nose, two black eyes, and several contusions and abrasions as a result of the sergeant's use of excessive force.  Second, six off-duty officers from the department engaged in a violent brawl outside a Springfield restaurant in April 2015, prompting the Massachusetts Attorney

General to pursue criminal charges against the officers. Third, a former narcotics bureau officer was indicted in January 2016 for stealing almost $400,000 from the department's evidence room. These incidents were widely publicized and raised concerns about the ability of the district attorney's office to rely on testimony from "discredited" officers in the department, as well as the "willingness of officers to cover up" constitutional violations and systemic deficiencies.

The DOJ released a report of its findings in July 2020, concluding that there was "reasonable cause to believe" that the narcotics bureau engaged in a "pattern or practice of excessive force." More specifically, on various occasions narcotics bureau officers punched individuals in the face, escalated encounters with civilians unnecessarily, and utilized "unreasonable takedown maneuvers." The DOJ also concluded in its report that it was "not uncommon" for narcotics bureau officers to write "false or incomplete" reports to justify their use of force. According to the DOJ report, officers often used "vague" or "rote" language in prisoner injury reports to prevent further investigation. For example, the DOJ report cites a prisoner injury narrative in which narcotics bureau officers claim that they had to "bring . . . down" an individual resisting arrest "face first, onto the sidewalk," where she "sustained scrapes to her face area." There were no further

details describing the individual's resistance, the officers' reactions, or the extent of her injuries.

The DOJ report attributed its findings to systemic policy and training deficiencies within the department, such as a failure of senior command to report use of force incidents to the department's internal investigations unit. Additionally, an April 2019 report issued by the Police Executive Research Forum found "significant departures" within the department from national guidelines for best practices issued by the DOJ in 2008.

In preparing its report, the DOJ reviewed "over 114,000 pages in total, including [the department's] policies and procedures; training materials related to the use of force and accountability; [the department's] internal affairs protocols; and other materials relating to the general operations of the [d]epartment and use-of-force practices in particular." This review included over one hundred reports from over one hundred internal investigations conducted by the internal investigations unit, as well as seventy-four personnel files. The DOJ also interviewed a broad swath of officers, community members, city officials, and lawyers. Significantly, the DOJ obtained every arrest report and use-of-force report drafted by the department from 2013 to 2018, and every prisoner injury file created from 2013 to 2019.

However, the DOJ report provides minimal details concerning the incidents on which it is based and does not identify by name any officers or civilians involved with these incidents. Indeed, the DOJ report describes several "unadjudicated allegations of misconduct," which the special master subsequently deemed difficult to identify from the current record.

Although the exact number cannot be known due to some factual overlap between the anonymized incidents, there are roughly twenty-three incidents of misconduct involving the department that are described within the DOJ report. Sixteen incidents have been identified by the city solicitor, some of which are discussed infra, while the rest remain outstanding. Although the city solicitor has promised that "any and all records which can be made available to [the district attorney's office] that can be identified as reviewed by [the] DOJ will be provided to [the district attorney's office upon] request," neither the district attorney's office nor the department knows for certain the exact documents upon which the DOJ report is based. The department opened its record management system to the DOJ but is "not sure" whether information technology professionals can accurately track what records the DOJ accessed, and the DOJ refuses to specifically identify the documents underlying its report.

As a result of the findings in the DOJ report, in April 2022, the DOJ sued the city in Federal court.  The DOJ asserted that the department "had engaged in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, and immunities secured and protected by the Constitution and laws of the United States."  Simultaneously, the DOJ and the city filed a settlement agreement, which was approved by a United States District Court judge shortly thereafter and entered as a consent decree.  While the city did not admit to any wrongdoing by the department, the consent decree outlines detailed policy reforms to be adopted by the department and calls for the appointment of a "compliance evaluator" to oversee the department's progress.

Two incidents alluded to within the DOJ report are identifiable on their facts and are discussed infra:  first, an incident involving Officer Gregory Bigda, a member of the department; and second, an incident outside a Springfield restaurant.

A.  Officer Bigda incident.  On the night of February 26, 2016, Bigda arrested three juveniles for the theft of an unmarked police vehicle and interrogated them at the Palmer police station.  A video recording (video) of the interrogation shows that no parent or guardian was present during Bigda's questioning.  In the video, Bigda uses profane and racist

language, and threatens the juveniles with physical violence and a lengthy incarceration. Further, Bigda can be heard threatening to plant evidence on the juveniles and assuring them that he would "get away with it."

On February 29, 2016, the district attorney's office requested a copy of the interrogation video from the Palmer police department and, on receipt in March 2016, made the video available to defense counsel for the three juveniles. In July 2016, an assistant district attorney assigned to prosecute the juveniles viewed the video and brought it to the attention of his supervisor, who then alerted the first assistant district attorney, Jennifer Fitzgerald. The district attorney's office subsequently disclosed the video in all cases where Bigda was involved.

Aside from Bigda, two other officers from the department were present during the video recording of this interrogation: Luke Cournoyer and Jose Robles. While Cournoyer was in the interrogation room, Robles was in the dispatch room, from which he could see and hear parts of the interrogation. The two officers neither intervened nor reported the incident prior to the video's release to the public. It is unclear from the record whether other officers from the department were present at the police station during this incident.

In addition to the video, a report by an officer from the Wilbraham police department involved in the arrest of the juveniles states that an unidentified plainclothes officer from the department kicked one of the juveniles.  The kicking was alleged to have occurred during the arrest.  Although the district attorney's office disclosed this report to defense counsel for the three juveniles, it did not disclose the report to defendants in any other cases -- reasoning that, without the clear and certain identification of the officer whose testimony might be subject to impeachment, the district attorney's office would be unable to identify any cases in which to make the necessary disclosure.

Fitzgerald testified about this incident during an evidentiary hearing before the special master in September 2022.  Responding to a scenario where one officer among several used excessive force, Fitzgerald stated that if "[the district attorney's office] can't identify who [the violating officer] is, I can't turn it over" to defense counsel.  Therefore, although other officers informed Fitzgerald that one of two officers in the department, either Steven Vigneault or Bigda, probably kicked the juvenile, the policy of the district attorney's office still did not require disclosure of this incident because there was "nothing concrete to prove" which officer kicked the juvenile.

Initially, Vigneault was federally indicted for kicking the juvenile. This indictment was dismissed on January 22, 2020, after the juvenile identified Bigda as his assailant. Bigda was then indicted in Federal court for civil rights violations in connection with the arrest and interrogation of the juveniles. He was acquitted in December 2021 and is no longer employed by the department.

B. <u>Springfield restaurant incident</u>. In April 2015, multiple off-duty officers in the department physically assaulted patrons outside a Springfield restaurant. After kicking and punching the patrons, the off-duty officers fled the scene. The department investigated the incident, wrote a report, and referred the matter to the internal investigations unit for further investigation and reporting. In October 2015, the department further referred the matter to the district attorney's office to determine whether to bring criminal charges against the officers involved in the incident. It took "nearly a year" before the department provided the full file of the internal investigations unit's investigation to the district attorney's office.

Ultimately, the district attorney's office concluded that it lacked probable cause to bring criminal complaints against any of the officers, because the evidence failed to sufficiently identify the perpetrators of any criminal acts. The district

attorney's office publicly issued a report to this effect in February 2017, posting the report to the website of the district attorney's office and providing the report to media outlets. However, as in the Bigda incident, the district attorney's office did not provide the report to defense counsel in any cases involving the officers present at the restaurant, as the district attorney's office apparently was unable to attribute any criminal offenses to any particular officers.

The district attorney's office then referred the matter to the United States Attorney's office, which in turn referred the matter to the Attorney General. She presented the facts to a special Statewide grand jury, which issued indictments against fourteen of the department's officers for a variety of crimes, including assault, perjury, filing false reports, and conspiracy. The department subsequently placed all fourteen officers on leave, although at least five have since been reinstated. At the request of the district attorney's office, the Attorney General provided a letter describing the charges against each officer. However, the Attorney General did not provide grand jury minutes, copies of the indictments, or any additional materials to the district attorney's office. At the time of the special master's report, only two officers had been convicted, and charges remained pending against several others.

ii. <u>Efforts to investigate DOJ report allegations</u>. In the wake of the DOJ report, both the department and the district attorney's office have made attempts to investigate the anonymized findings of the DOJ report and link them to identifiable cases. These efforts are summarized as follows.

A. <u>Kent rebuttal</u>. Following the publication of the DOJ report, in October 2020, Deputy Chief Steven Kent of the department drafted a twenty-eight page internal document titled "Rebuttal to the Department of Justice Investigation of the Springfield, Massachusetts Narcotics Bureau" (Kent rebuttal). In this document, Kent identified many of the individuals and sixteen of the twenty-three incidents referred to in the DOJ report. He concluded that "errors and discrepancies" in the DOJ report undermined its conclusions and wrongfully tarnished the department.

The district attorney's office knew of the Kent rebuttal's existence as early as March 2021.[5] However, as of October 18, 2022, when the special master issued her report, the department

---

[5] Although the special master found that the district attorney's office knew of the Kent rebuttal's existence as of July 2, 2021, we do not accept the special master's finding as to this date. See <u>New England Oil Ref. Co.</u> v. <u>Canada Mexico Oil Co.</u>, 274 Mass. 191, 197-198 (1931) (facts within special master's report become indisputable only when special master's report is confirmed). This error was pointed out by the plaintiffs in their objections to the special master's factual findings.

had "refused to divulge" the Kent rebuttal to the district attorney's office or anyone else.  Then, in March 2023, although the Kent rebuttal had been shielded from production by the work product privilege up to that point, it was released to the public by city officials.

The plaintiffs take issue with the Kent rebuttal for three reasons.  First, Kent was implicated by the very report that he sought to debunk, undermining his credibility.  Second, the plaintiffs do not believe that Kent's investigation satisfied the Commonwealth's broader investigatory obligations following the DOJ report.  Third, the plaintiffs assert that the delayed disclosure of the Kent rebuttal is an example of the district attorney's failure to obtain and disclose potentially exculpatory evidence.

B.  District attorney's review of materials underlying DOJ report.  On May 19, 2021, the district attorney commenced suit against the United States Attorney in Federal court, seeking access to the falsified reports made by members of the department that underlie the DOJ report.  See generally Gulluni v. United States Attorney for Dist. of Mass., 626 F. Supp. 3d 323 (D. Mass. 2022).  Ultimately, the court deferred to the executive branch decision to withhold the documents and granted the defendant's motion for summary judgment.  The United States Court of Appeals for the First Circuit later upheld this

decision, noting that the district attorney "already has access to all the underlying documents on which DOJ relied in compiling its report."  See Gulluni v. Levy, 85 F.4th 76, 77, 84 (1st Cir. 2023).

During this time, the district attorney continued to seek from the department the materials underlying the DOJ report.  On July 2, 2021, in response to inquiries from Fitzgerald, the city solicitor sent her approximately 700 to 800 pages of materials, describing the sixteen incidents that the department had been able to identify from the DOJ report.  These materials included summaries of the incidents, arrest reports, and, where applicable, the internal investigations unit's case numbers.  The city solicitor expressly indicated that the information provided by the city was "not exhaustive as to each incident."  However, the city solicitor stated that the department was willing to provide the district attorney with access to all files known to have been reviewed by the DOJ.

On receiving these materials, the district attorney began to link the identified officers and incidents to some 8,000 pending or past cases.  From there, the district attorney endeavored to identify the attorney of record in each case.  The district attorney then sent each identified attorney of record redacted copies of the materials provided by the city solicitor.  However, the district attorney did not make these same

disclosures to pro se litigants, and in the disclosures made, the district attorney did not explain that the review of each incident was not exhaustive. There is some dispute as to the number of defendants who since have reached out to obtain unredacted materials.

The plaintiffs allege that the district attorney has been deficient in the review of the materials underlying the DOJ report, having only reviewed 712 pages -- that is, "less than [one percent]" -- of the approximately 114,000 pages reviewed by the DOJ. No further detail about these 712 pages has been provided. However, the number of pages purportedly reviewed by the district attorney coincides with the approximate number of pages provided to the district attorney by the city solicitor. The plaintiffs also note that Fitzgerald's request for information from the city solicitor came two days after the plaintiffs commenced this action, which the plaintiffs allege reflects the district attorney's failure to act independently to satisfy its investigatory obligations.

iii. District attorney's withholding of adverse credibility determinations. As a matter of policy, the district attorney's decision whether to disclose adverse credibility findings made against officers in the department is based, in part, on whether the district attorney agrees with the findings. The plaintiffs contend that this practice constitutes the

systematic withholding of exculpatory evidence related to police misconduct.

In exploring this disclosure policy, the special master reviewed at least thirteen instances in the record in which the district attorney failed to disclose potentially exculpatory findings that an officer was untruthful.  Two such instances are described infra.[6]

First, during an August 2018 hearing in connection with Commonwealth vs. Morales, Mass. Super. Ct., No. 1779CR00375 (Hampden County Aug. 28, 2018), and Commonwealth vs. Santiago, Mass. Super. Ct., No. 1779CR00376 (Hampden County Aug. 28, 2018), the motion judge found that the testimony of an officer "plainly stated was not credible," and went on to stress that the officer's testimony was "fanciful" and "a made up tale." Despite this strong language, the district attorney conducted an independent evaluation and found that the testifying officer had "misunderstood, but did not misrepresent" relevant facts during his testimony.  Therefore, the district attorney's office did

---

[6] The special master's discussion of other instances where the district attorney's office failed to disclose potentially exculpatory findings that an officer was untruthful breaks down into two main categories.  In the first category, judges discredited the testimony of officers from the department in granting a defendant's motion to suppress.  In the second category, officers who had served as prosecution witnesses either testified about their prior dishonest conduct or were later indicted for their misconduct.

not disclose the motion judge's findings in other cases involving the testifying officer.

Second, in Commonwealth vs. Perez, Mass. Dist. Ct., No. 1923CR000353 (Springfield Div. Feb. 7, 2019), a defendant was shot multiple times by arresting officers in the department. After a January 2019 hearing, a District Court judge found that the version of the shooting offered by the officers was "not consistent with the physical evidence," such that there was "substantial incongruity" between the officers' assertions and the location of the gunshot wounds. The judge went so far as to say that the "incongruity defies the objective evidence and almost belies common sense." Nonetheless, after an internal investigation of the incident, the department and the district attorney's office independently concluded that the shooting was lawful. Therefore, the district attorney's office did not disclose the judge's comments in other cases in which the officer was involved.

c. Procedural history. On April 6, 2021, the plaintiffs commenced this action, seeking relief from a single justice of this court under G. L. c. 211, § 3, and G. L. c. 231A, § 1. On April 19, 2022, after the parties filed their briefs and after a series of hearings, interim orders, and status reports, the single justice appointed a special master to determine the relevant facts, make credibility determinations, and report any

recommendations and conclusions of law to the single justice. The special master then conducted a four-day evidentiary hearing and issued a report of her findings on October 18, 2022. On January 30, 2023, the single justice reserved and reported the case to the full court.

2. <u>Discussion</u>. The plaintiffs put forward numerous allegations concerning the failings of the district attorney's office. Importantly, the plaintiffs assert that the district attorney's office has committed a breach of an ongoing duty to learn of the department's misconduct and, further, to disclose this misconduct to affected defendants in pending and past criminal cases.

More specifically, the plaintiffs argue that several policies and practices of the district attorney's office demonstrate an overly narrow view of its disclosure obligations. Among these policies and practices, they challenge the practice of the district attorney's office of disclosing judicial findings of adverse credibility made against officers in the department on a discretionary basis to defendants and their counsel. Similarly, the plaintiffs challenge the policy of the district attorney's office of withholding instances of officer misconduct where multiple officers are involved and the wrongdoer cannot be clearly identified. They also allege that a "trifecta" of charges is routinely used to cover up excessive

force within the department:  resisting arrest, disorderly conduct, and assault and battery on a police officer.

In addition to the disclosure-related failures of the district attorney's office, the plaintiffs also allege that the district attorney's office failed to adequately investigate the department following the DOJ's finding of a pattern or practice of misconduct within the department, as required by Cotto, 471 Mass. at 112, and Ware, 471 Mass. at 95.  Specifically, the plaintiffs claim that the district attorney's office failed to obtain any documents from the department until the plaintiffs commenced this suit.  Then, after receiving "some" relevant documents from the department, the district attorney's office further failed to fulfill its investigatory obligations; instead of obtaining the outstanding documents and sending complete copies of any exculpatory material directly to all affected defendants, the district attorney's office sent redacted, limited exculpatory material en masse to the last attorneys of record for affected defendants.

By way of relief, the plaintiffs request that this court "institute [interim] remedies" until the district attorney's office completes an investigation of the department.  The range of the requested relief sweeps broadly, including the creation and monitoring of a list of officers connected to the misconduct, ensuring that defendants receive evidence as it

becomes available, instituting a judicial presumption favoring the admissibility of the DOJ report, crafting jury instructions tailored to cases involving former narcotics bureau officers within the department, limiting the admissibility of police reports at hearings, and fashioning "other relief that the [c]ourt deems fit."

In evaluating the plaintiffs' claims and requested relief, we must first discuss the legal obligations of prosecutors -- particularly their duty to disclose information that tends to exculpate criminal defendants and their duty to seek out such information. We next determine whether the district attorney's office met its prosecutorial obligations here. Where the district attorney's office has failed in either duty, and in response to the systemic issues within the department that have been identified by the DOJ report, we then craft the appropriate remedy under our supervisory authority. See G. L. c. 211, § 3. See also Commonwealth v. Hallinan, 491 Mass. 730, 747 (2023), quoting Brantley v. Hampden Div. of the Probate & Family Court Dep't, 457 Mass. 172, 183 (2010) ("Allegations of systemic abuses affecting the proper administration of justice are particularly appropriate for review pursuant to G. L. c. 211, § 3").

a. Duty to disclose exculpatory material. "The due process clauses of the Federal Constitution and the

Massachusetts Declaration of Rights require that the Commonwealth disclose to a defendant material, exculpatory evidence in its possession or control."  Committee for Pub. Counsel Servs., 480 Mass. at 731.  See art. 12 of the Massachusetts Declaration of Rights (guaranteeing every criminal defendant "shall have a right to produce all proofs, that may be favorable to him").  To be considered exculpatory, and therefore subject to automatic disclosure, evidence need only "tend to diminish [a defendant's] culpability."  Matter of a Grand Jury Investigation, 485 Mass. 641, 647-649 (2020).  The defendant need not request exculpatory material to mandate this disclosure.  See Commonwealth v. Bing Sial Liang, 434 Mass. 131, 135 (2001).

The Commonwealth's duty to disclose exculpatory evidence to criminal defendants is further reflected in our rules of criminal procedure and rules of professional conduct.  See Committee for Pub. Counsel Servs., 480 Mass. at 730-731.  See also Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004) (governing discovery procedures); Mass. R. Prof. C. 3.8 (d), as appearing in 473 Mass. 1301 (2016) (mandating that prosecutor "make timely disclosure" of all evidence that "tends to negate the guilt of the accused").  This duty to disclose derives from the core responsibility of a prosecutor "to administer justice

fairly." Committee for Pub. Counsel Servs., supra at 730, quoting Commonwealth v. Tucceri, 412 Mass. 401, 408 (1992).

A prosecutor's duty to disclose extends to all facts within the "possession, custody, or control" of a member of the prosecution team. Bing Sial Liang, 434 Mass. at 135. The prosecution team generally is understood to include prosecutors and relevant law enforcement personnel. See Commonwealth v. Beal, 429 Mass. 530, 531-532 (1999). Put differently, "[a] prosecutor's obligations extend to information in possession of a person who has participated in the investigation or evaluation of the case and has reported to the prosecutor's office concerning the case." Commonwealth v. Martin, 427 Mass. 816, 824 (1998) (including State police crime laboratory chemists within prosecution team). See Bing Sial Liang, supra (including victim and witness advocates within prosecution team); Beal, supra at 532-533 (excluding complainants and independent witnesses unaffiliated with investigation from prosecution team); Commonwealth v. Woodward, 427 Mass. 659, 679 (1998) (including medical examiner within prosecution team).

A prosecutor's duty to disclose necessarily encompasses information that may not even be known to the prosecutor or housed within his or her files, so long as the information is related directly to the crimes at issue and is in the possession of some prosecution team member. See Martin, 427 Mass. at 823-

824; Commonwealth v. Gallarelli, 399 Mass. 17, 20 n.4 (1987). See also Commonwealth v. Sullivan, 478 Mass. 369, 380-384 (2017). That is, prosecutors have a duty to disclose exculpatory evidence in possession of all members of the prosecution team -- including police officers on the team. See Matter of a Grand Jury Investigation, 485 Mass. at 658-659. As a result, when a prosecutor or any member of the prosecution team learns that police officers either "lied to conceal the unlawful use of excessive force" or lied about a defendant's conduct and the applicable charges, the prosecutor must disclose the untruthful conduct in any criminal case in which that officer prepared a report or may serve as a witness. Id. at 658.

Importantly, neither a prosecutor's decision to disclose nor a prosecutor's constitutional obligations under Brady v. Maryland, 373 U.S. 83, 87-88 (1963), are dependent on the "ultimate admissibility of the information," but only on their tendency toward exculpating a defendant. See Matter of a Grand Jury Investigation, 485 Mass. at 653. Indeed, Massachusetts prosecutors must "err on the side of caution" when deciding whether to disclose. Id. at 650.

Turning to United States Supreme Court precedent, the existence of exculpatory information known only to officers on the prosecution team and not to the individual prosecutor does

not alter this analysis. See <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 438 (1995) (prosecutors are still responsible for "evidence known only to police investigators and not to the prosecutor"); <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150, 154 (1972); <u>Drumgold</u> v. <u>Callahan</u>, 707 F.3d 28, 38 (1st Cir. 2013) ("Subsequent to <u>Brady</u>, the Supreme Court clarified that this affirmative disclosure obligation also encompasses evidence known only to law enforcement officers and not to prosecutors"). Accordingly, to comply with its obligations under <u>Giglio</u>, <u>supra</u>, to disclose information known to the prosecution team, it behooves the prosecutor's office to institute formal disclosure procedures to ensure the communication of all material information to defense counsel.[7]

However, as we have stated, "[w]e do not possess the authority to require the Attorney General and every district attorney in this Commonwealth to promulgate a comparable [<u>Giglio</u>] policy." <u>Matter of a Grand Jury Investigation</u>, 485 Mass. at 660. See art. 30 of the Massachusetts Declaration of Rights. Nonetheless, "we strongly recommend that they do." <u>Id</u>. That said, it is important to recall that "[n]o checklist can

---

[7] Following <u>Giglio</u>, the DOJ promulgated a "Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses" (also known as the "<u>Giglio</u> Policy") to better effect disclosure. <u>Matter of a Grand Jury Investigation</u>, 485 Mass. at 658.

exhaust all potential sources of exculpatory evidence."
Committee for Pub. Counsel Servs., 480 Mass. at 733.

We now examine two key practices of the district attorney's office that implicate a prosecutor's duty to disclose: one, the practice of the district attorney's office of disclosing adverse credibility determinations made about witnesses from the department only on a discretionary basis; and, two, the practice of the district attorney's office of withholding misconduct of the department's officers where multiple officers are involved in an incident and no one action can be attributed to any one officer.

i. Discretionary disclosure of adverse credibility determinations. In her testimony, Fitzgerald confirmed the plaintiffs' allegation that the district attorney's office does not automatically turn over every judicial finding of adverse credibility made against a police witness to defense counsel. Rather, the district attorney's office independently determines whether the judge's adverse credibility finding is exculpatory. This practice of disclosing adverse credibility findings only on a discretionary basis violates disclosure obligations.

As discussed above, prosecutors' disclosure obligations extend to exculpatory information held by members of the prosecution team. See Bing Sial Liang, 434 Mass. at 135. Officers involved in the prosecution of a case are members of

the prosecution team, such that prosecutors are duty-bound to disclose exculpatory facts in their possession. See Beal, 429 Mass. at 531-532. Adverse credibility findings made about police witnesses are exculpatory, as they may undercut the prosecution's case and therefore tend to diminish the defendant's culpability. See Matter of a Grand Jury Investigation, 485 Mass. at 647-649. See also Commonwealth v. Diaz, 100 Mass. App. Ct. 588, 594 (2022) (to be exculpatory, evidence "must simply tend to negate the guilt, or to reinforce the innocence, of the accused"). Therefore, adverse credibility findings about a police witness fall within the scope of a prosecutor's disclosure obligations and must be shared with the defense. Again, "the ultimate admissibility of the information is not determinative of the prosecutor's Brady obligation to disclose it." Matter of a Grand Jury Investigation, supra at 653.

A prosecutor's obligation to disclose exculpatory material is just that -- an obligation, not a decision. See Matter of a Grand Jury Investigation, 485 Mass. at 646-647 (reiterating that prosecutor "must" disclose exculpatory information). Therefore, prosecutors cannot, consistent with their obligation to disclose exculpatory information, withhold at their discretion the fact that a judge has determined that an officer's statements were not credible.

Whether the district attorney's office was on notice before of a pattern of dishonesty on the part of prosecution witnesses from the department, see Martin, 427 Mass. at 823-824 (duty to disclose applied to State police crime laboratory reports unknown to prosecutor but held by prosecution team member), it is now. See Commonwealth v. Baldwin, 385 Mass. 165, 177 (1982) (potentially exculpatory information known to prosecution cannot be withheld from defense with impunity). Allowing a police officer to take the witness stand with knowledge of a prior determination as to the officer's dishonesty and without making the necessary disclosures of this determination violates the ethical and legal duties of a prosecutor. See Mass. R. Crim. P. 14 (imposing duty to disclose any facts of exculpatory nature); Mass. R. Prof. C. 3.8 (g) (prosecutor cannot avoid seeking evidence favorable to other side). See also Matter of a Grand Jury Investigation, 485 Mass. at 658 (duty to disclose requires sharing police dishonesty with defendants "in any criminal case where the officer is a potential witness or prepared a report"). See e.g., Milke v. Ryan, 711 F.3d 998, 1006 (9th Cir. 2013) (prosecutor's failure to disclose adverse credibility findings against police witness was "akin to active concealment").

ii. Disclosure of incidents where officer remains unidentified. Similarly, the practice of the district attorney's office of withholding known instances of police

misconduct when the district attorney's office cannot attribute particular criminal acts to particular officers -- as in the Springfield restaurant and Bigda incidents -- violates the duty of the district attorney's office of disclosure. Put differently, when a subset of a known number of officers has committed misconduct, and it is unclear which officer or officers are the offenders, the district attorney's office cannot shirk its disclosure obligations, but rather must disclose the incident in any cases involving any of the officers who could be the possible offenders.

Pending criminal investigations involving and known to members of the prosecution team require disclosure. See Matter of a Grand Jury Investigation, 485 Mass. at 647. As discussed previously, officers from the department who are involved in the prosecution of a case are members of the prosecution team, and any exculpatory information known to them triggers the disclosure obligations of the district attorney's office. See Bing Sial Liang, 434 Mass. at 135. Because a pending criminal investigation against any member of the prosecution team holds possible impeachment value for a defendant, it is exculpatory. See Matter of a Grand Jury Investigation, supra. Such investigations would require disclosure under the Federal Giglio policy, and we subscribe to an even broader understanding of the Commonwealth's disclosure obligations. See id. at 649. See

also United States Department of Justice, Justice Manual, tit. 9-5.100(5)(c)(iii) (updated Jan. 2020) [https://perma.cc/NKL2-YZ2J] (Justice Manual) ("any allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a pending investigation" requires disclosure). Again, admissibility is not a prerequisite for disclosure. "Rather, once the information is determined to be exculpatory, it should be disclosed -- period. And where a prosecutor is uncertain whether information is exculpatory, the prosecutor should err on the side of caution and disclose it." Matter of a Grand Jury Investigation, supra at 650.

The requirement to disclose pending criminal investigations is distinct from our discussion of pending civil lawsuits in Commonwealth v. McFarlane, 493 Mass.    (2024), also released today. Pending civil lawsuits are not subject to automatic disclosure obligations because, "until there is finding of civil liability, a pending lawsuit may well be without merit." Id. at    . In contrast, in the case of a pending criminal investigation such as the investigation following the Springfield restaurant incident, even if the extent of an officer's participation in criminal misconduct is unclear, an officer's known presence at the restaurant, coupled with reports of physical force by ten to fifteen off-duty officers causing the injuries of several victims at that scene, is potentially

exculpatory and enough to mandate disclosure. See Matter of a Grand Jury Investigation, 485 Mass. at 650 (evidence that would tend to exculpate defendant, including by impeaching credibility of key prosecution witness, must be disclosed). Similarly, in the Bigda incident, where a police witness reported that a plain clothes officer kicked a juvenile, and multiple different officers reported to the district attorney's office that the offender was one of two plain clothes officers, see part 1.b.i.A, supra, that information is potentially exculpatory, and the incident must be disclosed to defense counsel. See Matter of a Grand Jury Investigation, supra. Neither allegation is unsubstantiated -- both are supported by witness statements, police investigation and reporting, and identifiable, injured victims. Cf. Justice Manual, tit. 9-5.100(6) (unsubstantiated allegations of misconduct outside scope of impeachment material).

In other words, the extent of an officer's involvement need not be clearly proven for the incident to be disclosed; instead, if evidence known to the prosecution team "would tend to exculpate the defendant or tend to diminish his or her culpability," it must be disclosed. Matter of a Grand Jury Investigation, 485 Mass. at 649 (Massachusetts has broader duty to disclose than Federal Brady requirements). Because the current disclosure policy of the district attorney's office

trends toward requiring such clear proof, it imposes too high of a bar. Once disclosure has been accomplished, defense counsel may then investigate further to clarify the extent of an officer's involvement. See id. at 653 (disclosure allows defense counsel to "probe more deeply" for favorable evidence).

To allow pending criminal investigations into police misconduct known to the prosecution team to go undisclosed would be to set up a system where a "prosecutor may hide, [and a] defendant must seek," exculpatory information. Commonwealth v. Baran, 74 Mass. App. Ct. 256, 299 (2009), quoting Banks v. Dretke, 540 U.S. 668, 696 (2004) (troubling failure of prosecutor to produce materials that "might have supported [exculpatory] inference"). Rather, a prosecutor's duty of disclosure tacks toward sharing information and demands a concurrent duty, that of inquiring about the existence of potentially exculpatory information.

b. Duty to investigate police misconduct. The Commonwealth's duty to disclose exculpatory information to defendants walks hand-in-hand with its duty to inquire about such information. Learning that a member of the prosecution team has been accused of misconduct triggers the Commonwealth's "duty to conduct a thorough investigation to determine the nature and extent" of that misconduct. Ware, 471 Mass. at 95. This duty of inquiry is premised on the prosecutor's duty to

"learn of and disclose" any exculpatory evidence held by any member of the prosecution team.  Id.  See Cotto, 471 Mass. at 112.  In order to protect the integrity of the criminal justice system and the rights of individual defendants, this inquiry must be taken seriously by the prosecution and conducted in a timely fashion.  See Cotto, supra at 111-112.

Relying on both Ware and Cotto, the plaintiffs claim that the findings in the DOJ report have triggered the duty of the district attorney's office to investigate the department.  The plaintiffs further invoke Cotto to seek this court's continued supervision over the investigation by the district attorney's office into the department.  Both Ware, 471 Mass. at 86, and Cotto, 471 Mass. at 98, concerned the actions of Sonja Farak, a chemist at the Department of Public Health's State Laboratory Institute (drug lab) whose misconduct ultimately compromised tens of thousands of drug-related convictions.  These two cases impose a duty on the Commonwealth to investigate known misconduct to determine its "timing and scope" and "remove the cloud that has been cast over the integrity" of the criminal justice system.  Cotto, supra at 115.  See Ware, supra at 95.

In Ware, 471 Mass. at 86, the defendant had been convicted of various drug offenses during the period of Farak's employment as a drug lab chemist for the Commonwealth, and sought postconviction relief -- namely, the ability to retest drug

evidence taken by the department during the period of Farak's employment. The defendant did not claim that Farak herself had tested the drug samples that led to his conviction. See id. Rather, the defendant's goal was to determine when exactly Farak's misconduct began. See id. at 92-93.

On review, we determined that the Commonwealth had failed to conduct a thorough investigation of Farak's misconduct, such that the "magnitude and implications of the problem" had not been ascertained. Id. at 96. Although "[t]he State police spent a few days looking for missing evidence, searching Farak's vehicle, interviewing her colleagues, conducting an inventory of the facility, and searching a tote bag that had been seized from Farak's work station," id., this "cursory" investigation failed to completely capture Farak's misconduct, id. at 92, 96. Therefore, we allowed the defendant to conduct postconviction discovery and urged the Attorney General to lead an investigation into the Farak matter. See id. at 96 & n.14.

Our decision in Cotto, released the same day as Ware, similarly focused on the ramifications of Farak's misconduct. There, the defendant had been convicted of selling cocaine and sought to withdraw his guilty pleas because his alleged cocaine sample had been tested by Farak. See Cotto, 471 Mass. at 98-102. This court again noted the "absence of a thorough investigation [into Farak's actions] by the Commonwealth,"

particularly in comparison to the similar case of Annie Dookhan. Id. at 108-111.  Dookhan was a chemist at a different State drug laboratory who had engaged in a variety of misconduct, ranging from falsifying results and reports to wrongfully removing and contaminating drug samples.  See id. at 111.  In some instances, Dookhan provided test results without testing individual samples, a practice known as "dry labbing."  See id. at 106-107, 111.  In the wake of Dookhan's misconduct, the State police detective unit in the Attorney General's office conducted a broad formal investigation of her time at that drug laboratory. See id. at 111.  Comparatively, by the time we issued our decision in Cotto, no such investigation had yet been undertaken of Farak's misconduct.  See id.  In light of the Commonwealth's failure to investigate, this court in Cotto entitled defendants affected by Farak's misconduct to retest their existing drug samples.  See id. at 114.  This court further demanded that the Commonwealth decide and report, within a month, whether it intended to pursue a more formal investigation of Farak's time as a chemist.  See id. at 115.

While we expounded on the Commonwealth's duty of inquiry in Cotto and Ware, the duty of inquiry predated those cases.  See, e.g., Martin, 427 Mass. at 823.  See also Commonwealth v. Donahue, 396 Mass. 590, 598 (1986) ("We have recognized, however, that, in some circumstances, the prosecutor should be

required to seek access to material and exculpatory evidence").
As we have previously emphasized, a prosecutor is expected to
actively seek out any exculpatory evidence held by the
Commonwealth or another member of the prosecution team. See
Martin, supra. For example, in Martin, this court reversed a
conviction because the prosecutor failed to turn over
exculpatory evidence that was unknown to him but known to the
Commonwealth's drug laboratory technician. See id. Despite his
ignorance, the prosecutor nonetheless had violated his "duty to
inquire" into the existence of tests conducted by the
Commonwealth. Id.

"'Reasonableness' is the only limitation on the
prosecutor's duty of inquiry." Commonwealth v. Frith, 458 Mass.
434, 440-441 (2010) ("a prosecutor's belief that no inquiry is
necessary or required in the circumstances of a particular case,
based only on the prosecutor's assumption that he already has
all of the items and information subject to discovery, does not
comport" with duty of reasonable inquiry). See Mass. R. Crim.
P. 14 (a) (3). Reasonableness demands, at the very least, that
prosecutors ask other members of the prosecution team whether
exculpatory information exists, particularly any information
specifically requested by defense counsel or required to be
disclosed under rule 14. See Diaz, 100 Mass. App. Ct. at 594
("The scope of reasonable inquiry for the prosecutor, informed

by the defense request for the call log data, extended to inquiring of the detectives whether that information was accessible to the government"). When a prosecutor is aware of potential misconduct involving a member of the prosecution team, the duty of reasonable inquiry also demands that he or she "conduct a thorough investigation to determine the nature and extent" of the misconduct. Ware, 471 Mass. at 95. See Cotto, 471 Mass. at 115 (prosecutors should determine "timing and scope" of known misconduct).

That is not to say that prosecutors must investigate on behalf of defense counsel, see Beal, 429 Mass. at 532, but rather that their duty of inquiry follows from the duty to disclose all exculpatory evidence held by members of the prosecution team. See Hallinan, 491 Mass. at 746, quoting Martin, 427 Mass. at 823-824. See also Frith, 458 Mass. at 441 ("it is incumbent on [a prosecutor] to ask a police prosecutor, or other similar official, whether all discoverable materials relating to a particular case have been given to the Commonwealth").

In discussing the discovery obligations of the Commonwealth in joint investigations with the Federal government, this court has outlined factors to determine "whether the prosecutor is obligated to seek requested exculpatory evidence" from Federal investigators. Donahue, 396 Mass. at 599. These factors --

"potential unfairness to the defendant; the defendant's lack of access to the evidence; the burden on the prosecutor of obtaining the evidence; and the degree of cooperation between" members of the prosecution team -- may be relevant in outlining the duty of inquiry more broadly. Id. See generally Hochman, Brady v. Maryland and the Search for Truth in Criminal Trials, 63 U. Chi. L. Rev. 1673, 1691 (1996) ("The contextual location of the evidence, the ease with which the prosecutor can acquire it, and the potential impact on the case better describe when the prosecutor constructively possesses evidence than any artificial line drawing").

The Supreme Court has couched a prosecutor's duty in similar terms. Because of the crucial truth-seeking role played by the prosecutor in criminal trials, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in a case, including the police." Kyles, 514 U.S. at 437. See Strickler v. Greene, 527 U.S. 263, 281 (1999). See also Giglio, 405 U.S. at 154 (one prosecutor responsible for information known to another prosecutor in same office). This duty to investigate is, again, inextricably tied to the prosecutorial duty to disclose -- whether a prosecutor succeeds or fails in learning of favorable evidence known to a member of the prosecution team, the prosecution's responsibility for failing to disclose that

evidence to defendants is "inescapable." Kyles, supra at 437-438.  Therefore, a prosecutor's duty of inquiry necessarily reaches police misconduct that may not be otherwise known to the prosecutor.

Other Federal courts agree that a prosecutor cannot avoid learning what other members of the prosecution team know "simply by declining to make reasonable inquiry of those in a position to have relevant knowledge." United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991).  Rather, prosecutors carry an additional obligation to disclose what they "do[] not know but could have learned" (citation omitted).  United States v. Cano, 934 F.3d 1002, 1023 (9th Cir. 2019), cert. denied, 141 S. Ct. 2877 (2021).  To conclude otherwise would be to "substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."  Kyles, 514 U.S. at 438.

With the foregoing in mind, we now examine whether the duty of the district attorney's office to investigate the department was triggered by the DOJ report and, concurrently, the scope of that duty to investigate.  We then touch on how the duty to investigate interacts with police department internal affairs records, bearing in mind that internal affairs investigations rely on confidentiality to work as intended.

i. Duty of district attorney's office to investigate department's records following DOJ report. The DOJ's finding of a pattern or practice of misconduct within the department provides the Commonwealth with certain knowledge of misconduct on the part of members of the prosecution team, raising "serious questions" about the integrity of their work on behalf of the Commonwealth. Cotto, 471 Mass. at 109-110. Therefore, the duty of the district attorney's office to investigate unquestionably was triggered by the DOJ report's findings. See Martin, 427 Mass. at 823 (prosecutor committed breach of duty of inquiry by failing to ask about exculpatory information that was unknown to him but known to member of prosecution team). The question then becomes the scope of the duty and whether the district attorney's office has satisfied that duty.

In the aftermath of the DOJ report, the district attorney's office took various steps to investigate the department's misconduct. After numerous attempts to have the DOJ share the materials from the department that were underlying the DOJ's report, the district attorney's office ultimately sued the DOJ for access. The district attorney's office also directly contacted the department, requesting access to the documents underlying the DOJ's report. The district attorney's office received between 700 and 800 documents from the city solicitor, which the district attorney's office then provided to counsel

for the impacted defendants that the district attorney's office could identify.  The 700 to 800 documents, mainly consisting of arrest reports or the internal investigations unit's case numbers, related to the sixteen incidents described in the DOJ report that could be reasonably identified by the department. By looking beyond its own files and asking members of the prosecution team, namely, the department, for access to any exculpatory materials, the district attorney's office took reasonable steps to inquire into the department's misconduct. See Martin, 427 Mass. at 823-824.

The duty of reasonable inquiry does not demand that the district attorney's office recreate the DOJ investigation.  See Beal, 429 Mass. at 532 (prosecutors need not act as defense investigators).  However, the district attorney's office was obligated to request that "all discoverable materials" be made available to the prosecution.  Frith, 458 Mass at 441.  By not following up on the city solicitor's offer to provide "any and all records" that were reviewed by the DOJ "at [the] request [of the district attorney's office]" and settling for the 700 to 800 documents provided, the district attorney's office fell short of meeting its duty of inquiry.  See id. at 440 (where prosecutors have knowledge of additional records related to ongoing matters, they are duty-bound to conduct "further inquiry" into those records).  See also Martin, 427 Mass. at 823 ("The Commonwealth

had the obligation to produce all [exculpatory evidence specifically requested by the defendant] in its possession").

As the duty of inquiry is bounded by "reasonableness," it is reasonable for the district attorney's office to, at the very least, obtain access to all materials from the department that were known to have been reviewed by the DOJ.  Frith, 458 Mass at 440-441.  Fairness dictates that the district attorney's office bears the burden of obtaining all evidence reviewed by the DOJ, rather than criminal defendants.  See Donahue, 396 Mass. at 600 (inability of defendant to obtain access to records that "may well have been available to the prosecutor on request" was factor in determining prosecutor's obligation).  Not only do defendants and prosecutors have asymmetrical access to exculpatory information here, but the city solicitor has explicitly offered to give the district attorney's office all materials that "can be identified as reviewed" by the DOJ.  The district attorney's office had a duty to inquire into all exculpatory evidence known to the prosecution team -- including the department's records that formed the basis of the DOJ report.

Because the exact documents reviewed by the DOJ cannot be known, the district attorney's office must gather all documents that fall within the general categories of documents identified by the DOJ to satisfy the investigatory obligations of the

district attorney's office.  That is, the DOJ listed the following categories of documents among those that it reviewed: the "[department's] policies and procedures; training materials related to the use of force and accountability; [the department's] internal affairs protocols; and other materials relating to the general operations of the [d]epartment and use-of-force practices in particular."  The DOJ also reviewed all arrest and use-of-force reports from 2013 to 2018, and every prisoner injury file created between 2013 and 2019.  Therefore, to the extent that these materials are not internal affairs records, subject to the discovery procedures laid out in Commonwealth v. Wanis, 426 Mass. 639, 642-644 (1998), and Commonwealth v. Rodriguez, 426 Mass. 647, 650 (1998), the district attorney's office must obtain all documents falling into these categories from the department in order to fulfill the duty of the district attorney's office of investigation. See Frith, 458 Mass at 441.  To the extent this gathering and review process yields more exculpatory information, that, too, must be obtained and disclosed by the district attorney's office.  See id. at 440-441.

ii.  Limitations on duty to inquire into police internal affairs records.  In discussing the duty of the district attorney's office of inquiry, the plaintiffs seek to revisit two

cases decided by this court:  Wanis, 426 Mass. 639, and Rodriguez, 426 Mass. 647.[8]

In Wanis, 426 Mass. at 640-642, the defendants attempted to compel the production of an internal police investigation about their arresting officer.  The question became whether police department internal affairs records fall within a prosecutor's automatic discovery obligations pursuant to Mass. R. Crim. P. 14.  See id. at 643.  This court deemed internal affairs divisions to be outside of the scope of the prosecution team and therefore "reject[ed] any suggestion" that internal affairs records, even if relevant and material, must be produced by the prosecution.  Id.  In so ruling, this court emphasized the

---

[8] The case of plaintiff Graham offers an example of the exculpatory materials that may be contained within police department internal affairs records.  In July 2017, Graham, a Black man, was in an altercation with two white off-duty officers.  One of the three men pointed a gun during this altercation, but it was unclear who did so, Graham or one of the officers.  When on-duty officers from the department arrived at the scene, Graham was arrested for, among other things, unlawful possession of a loaded firearm.  However, during the altercation, an unidentified 911 caller stated that the Black man involved did not have the gun.  After Graham filed a complaint against the arresting officers for assault, the internal investigations unit followed up with the 911 caller, who reiterated that the only person with a gun was a "white guy."  Accordingly, the special master later deemed the 911 call "clearly exculpatory."  The prosecutor was unaware of the internal investigations unit's investigation, and defense counsel did not obtain the report of that investigation.  Therefore, Graham was convicted without knowledge of this call and only obtained access to the internal investigation unit's file through the efforts of his appellate counsel.

importance of maintaining the integrity of internal affairs investigations and the morale of police officers. See id. at 645. Subjecting internal investigations to automatic discovery would strip away any assurance of confidentiality, potentially chilling cooperation with investigation efforts. See id.

Even while shielding internal affairs records from automatic disclosure, this court provided criminal defendants with avenues to access any salient information contained within internal affairs files. Under Wanis, 426 Mass. at 644, if a prosecutor actually possesses police department internal affairs records, the prosecutor must review that material in response to a rule 14 motion. If a prosecutor does not possess such records, a defendant may obtain the statements of percipient witnesses contained within an internal affairs file via a motion under Mass. R. Crim P. 17, as appearing in 378 Mass. 885 (1979). See id. If a defendant desires additional information, a summons for production must be sought and, if opposed, the defendant must make a specific, good faith showing of relevancy to a judge. See id. at 644-645.

Rodriguez, released together with Wanis, similarly involved a defendant's request for internal investigation records about an arresting police officer. See Rodriguez, 426 Mass. at 647. This court in Rodriguez again ruled that police department internal affairs records are not subject to automatic discovery

and fall outside the prosecutor's possession.  See id. at 648.
In lockstep with Wanis, this court ordered the keeper of the
internal affairs records to produce all statements by percipient
witnesses to the defendant, pursuant to rule 17.  See id. at
650.

Wanis and Rodriguez, together, place an explicit limitation
on a prosecutor's duty of inquiry by deeming records from police
department internal affairs divisions to be outside a
prosecution team's possession, custody, or control and,
therefore, outside the scope of prosecutors' disclosure
obligations under rule 14.  This limitation does "nothing to
relieve the Commonwealth of its ongoing duty to disclose
exculpatory information -- including any material, exculpatory
information related to past discipline or internal investigation
of the officer in question -- to the extent such information is
in the possession, custody, or control of the prosecution team."
Commonwealth v. Cruz, 481 Mass. 1021, 1022 (2018).

Our case law defines the scope of the prosecution team in a
manner consistent with the limitations in Wanis.  The
involvement of one police officer in a prosecution does not
render the entire police department part of the prosecution
team.  See Commonwealth v. Daye, 411 Mass. 719, 734 (1992).
Indeed, law enforcement agents or personnel who are not involved
in the prosecution of a case do not become members of the

prosecution team merely because they hold potentially exculpatory materials. See Commonwealth v. Campbell, 378 Mass. 680, 702 (1979) (prosecution had no duty to obtain potentially exculpatory records maintained by correction officials). See also Commonwealth v. Torres, 479 Mass. 641, 647-648 (2018) (Attorney General was not member of prosecution team, despite possessing relevant records, because Attorney General was not involved in prosecutor's investigation).

While some courts consider police "personnel records," including internal affairs reports, to fall within a prosecutor's disclosure obligations, see Milke, 711 F.3d at 1016 (imputing knowledge of police officer's personnel files, including internal affairs files, to prosecution for purposes of disclosure), Massachusetts is not alone in its reticence to open internal affairs records to every criminal defendant. See Denver Policemen's Protective Ass'n v. Lichtenstein, 660 F.2d 432, 437 (10th Cir. 1981) (using balancing test to "provide safeguards against unlimited review" of police personnel and inspection files). See e.g., State v. Roy, 151 Vt. 17, 31-33 (1989), overruled in part on other grounds by State v. Brillon, 2008 VT 35, ¶¶ 14-15 (internal investigation records held by police were outside possession of prosecutor).

Indeed, even courts that disagree and conclude that prosecutors constructively possess police department internal

affairs files acknowledge the importance of confidentiality here. See, e.g., Robinson v. State, 354 Md. 287, 309 (1999) ("The confidentiality interest must be balanced, in this context, against the confrontation and due process rights of the defendant"). For example, United States v. Brooks, 966 F.2d 1500, 1504 (D.C. Cir. 1992), cited by the plaintiffs, cabins a prosecutor's "duty to search" internal affairs files held by law enforcement agencies to where "there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the examination might yield material exculpatory information." In ruling that internal affairs files may fall within the prosecution's duty of inquiry under these conditions, the Brooks court noted that "[a]s the burden of the proposed examination rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort." Id. In other words, even if a prosecutor's duty of inquiry does extend to internal affairs records, this duty is not automatically triggered by the mere existence of such records. Rather, the court in Brooks was careful to avoid imposing an unconditional duty of inquiry on the prosecution.

Wanis and Rodriguez properly impose limits on a prosecutor's duty of inquiry, specifically as it pertains to internal affairs records. Therefore, we see no reason to overturn these decisions, and we decline the plaintiffs'

invitation to do so. Accordingly, regarding the internal affairs records identified by the DOJ in its report -- that is, "over [one hundred] report files for over [one hundred] internal investigations conducted by the [internal investigations unit], as well as [seventy-four] personnel files" -- the affected defendants may avail themselves of the disclosure procedures set out in Wanis and Rodriguez.

c. Global remedy. The plaintiffs seek a variety of remedies, mainly drawn from our actions in Bridgeman v. District Attorney for the Suffolk Dist., 476 Mass. 298, 315 (2017) (Bridgeman II).

In Bridgeman II, 476 Mass. at 299, this court crafted procedures for relief in the face of Dookhan's misconduct and its impact on more than 20,000 defendants. In deciding whether to grant a global remedy in Bridgeman II, id. at 315, we identified "four relevant principles of our criminal justice system." First, the government alone bears the burden of taking reasonable steps, including providing notice, to remedy egregious misconduct in the investigation or prosecution of a criminal case. Id. at 315-316. Second, relief from conviction typically requires a defendant to file a motion for a new trial. Id. at 316. Third, dismissal with prejudice is available where either (a) a prosecutor fails to disclose evidence that the defendant is entitled to receive and thereby "irremediabl[y]"

prejudices the defendant, or (b) the prosecutorial misconduct is egregious, deliberate, and intentional, or results in a violation of constitutional rights. Id. Fourth, where many have been wronged, "we do not throw up our hands and deny relief because it would be too difficult to accomplish." Id. at 317-318. Rather, the remedy must be fair, timely, and practical. Id. at 317. Together, these four principles guide our decision in "how best to balance the rights of defendants affected by governmental misconduct and society's interest in administering justice." Committee for Pub. Counsel Servs., 480 Mass. at 723.

Global remedies are appropriate where, in their absence, defendants wrongly would be forced to "bear the burden of a systemic collapse" that is "entirely attributable to the government." Hallinan, 491 Mass. at 748, quoting Bridgeman v. District Attorney for the Suffolk Dist., 471 Mass. 465, 476 (2015) (Bridgeman I). However, when possible, case-by-case adjudication remains "the fairest and best alternative" to resolve individual cases potentially tainted by government misconduct, as it is "most consistent and in harmony with the relevant principles of criminal justice." Bridgeman II, 476 Mass. at 326. Case-by-case adjudication can be "adapted" as necessary to make the process both "fair and workable." Id. It is appropriate particularly where, as here, prosecutorial misconduct is at issue, such that remedies should be "tailored

to the injury suffered and should not unnecessarily infringe on competing interests."  Committee for Pub. Counsel Servs., 480 Mass. at 725, quoting Commonwealth v. Carney, 458 Mass. 418, 427 (2010).

When faced with 20,000 cases affected by the misconduct of Dookhan in Bridgeman II, 476 Mass. at 300-301, this court eschewed the use of a global remedy and instead adopted a new case-by-case protocol for adjudication.  The facts are similar here.  Much like in Bridgeman II, id. at 314-315, the plaintiffs allege that the district attorney's office has fallen short in its prosecutorial duty of disclosure, creating a risk of harm to criminal defendants.  Likewise, as in Bridgeman II, id. at 308, the need to identify the defendants who may have been affected by the misconduct remains urgent.  Therefore, as in Bridgeman II, id. at 322, a global remedy is "neither as just nor as practical" as case-by-case adjudication here.

This is particularly true where the district attorney's office already has made necessary reforms to its disclosure policies in response to this litigation.  The district attorney's office now has an annual practice of requesting that police departments provide the names and supporting information of any officers who have been charged with a crime, found to be untruthful, or who have engaged in misconduct.  These officers then are included in the new internal database created and

maintained by the district attorney's office of <u>Brady</u> material, which is available to all assistant district attorneys and is organized by officer names.  The database includes law enforcement employees who have engaged in either criminal activity, deceitful behavior, or a pattern of discrimination. To put this database into action, the district attorney's office has developed a system to flag internal files for cases requiring disclosure.  Further, the district attorney's office has formed a "<u>Brady</u> Working Group" to formulate new disclosure practices.  This group developed a new "<u>Brady</u> Policy" for the district attorney's office that sets out disclosure obligations and procedures and "err[s] on the side of disclosure."  To ensure compliance and mitigate any risk of error, the district attorney's office has also instituted an "Exculpatory Evidence Team" to review disclosure questions.

Even with the aforementioned reforms in place, the plaintiffs unsuccessfully have sought access to the information underlying the DOJ report for years.[9]  The remedy here is simple:

---

[9] The case of plaintiff Lopez provides an example of the plaintiffs' efforts to obtain the documents from the department that underlie the DOJ report.  Lopez was a defendant in two criminal cases in Hampden County.  After the publication of the DOJ report in July 2020, Lopez's CPCS defense attorney undertook efforts to determine whether the officers in Lopez's case were implicated by the DOJ report.  These efforts continued over the course of approximately eighteen months.  In January 2022, the district attorney's office sent over 1,000 pages of files from the department's internal investigations unit to Lopez's defense

all defendants affected by the department's misconduct should have access to all materials known to have been reviewed by the DOJ in drafting its report.

To reiterate, because the DOJ will not divulge which specific documents it relied upon in drafting its report, the district attorney's office must "err on the side of caution and disclose" the five categories of the department's records that the DOJ is known to have reviewed:  (1) the department's policies and procedures; (2) the department's training materials related to the use of force and accountability; (3) the department's internal affairs protocols; (4) materials related to the general operations of the department and its use-of-force practices in particular; and (5) to the extent they do not fall within the ambit of Wanis and Rodriguez, arrest and use-of-force reports from 2013 to 2018 and prisoner injury files from 2013 to 2019.  See Matter of a Grand Jury Investigation, 485 Mass. at 650.  The DOJ has provided no further information about the materials underlying its investigation, so the district attorney's office must disclose what evidence it knows to be discoverable.

We realize that this necessarily entails the disclosure and subsequent review of a large number of the department's records.

---

counsel.  In March 2022, while his defense counsel was combing through these documents, Lopez pleaded guilty.

However, in light of the DOJ's finding in its report of a pattern or practice of misconduct and excessive force within the department, every underlying document has the potential to hold exculpatory value for a criminal defendant. See Matter of a Grand Jury Investigation, 485 Mass. at 650. Moreover, handing over all information that tends to exculpate criminal defendants -- a so-called "information dump" -- is the very disclosure requested by the plaintiffs. See id. It is the role of defense counsel to then sort through the information provided by the district attorney's office for relevant and exculpatory evidence -- it is not the responsibility of the district attorney's office to investigate on their behalf. See Beal, 429 Mass. at 532. See also Commonwealth v. Pisa, 372 Mass. 590, 595, cert. denied, 434 U.S. 869 (1977) ("a prosecutor cannot be expected to appreciate the significance of every item of evidence in his possession to any possible defense which might be asserted by the defendant"). Indeed, through total disclosure of the information underlying the DOJ report, defendants can have access to all potentially exculpatory information, and need not rely on any other agency to conduct a preliminary review that may actually limit their access to relevant, exculpatory information.

All records will be disclosed subject to a protective order. See Mass. R. Crim. P. 14 (a) (6) ("The judge may, for

cause shown, grant discovery to a defendant on the condition that the material to be discovered be available only to counsel for the defendant").  See also Committee for Pub. Counsel Servs., 480 Mass. at 733 ("Absent a protective order, no prosecutor, whether in the office of the Attorney General or in the office of a district attorney, has the authority to decline to disclose exculpatory information").  Because the plaintiffs sought relief from a single justice under our general supervisory authority, the district attorney's office and organizational plaintiffs will work together to disseminate the materials under the protective order.  See Commonwealth v. Mitchell, 444 Mass. 786, 795 (2005) (judge "has some measure of inherent authority" to issue protective orders).  See also Bridgeman II, 476 Mass. at 300-301.  See generally Commonwealth v. Holliday, 450 Mass. 794, 803, cert. denied sub nom. Mooltrey v. Massachusetts, 555 U.S. 947 (2008) (decisions surrounding protective order typically within discretion of trial judge).  Any further determinations about the protective order also will be decided by the single justice.  See Mass. R. Crim. P. 14 (a) (7) ("the judge may alter or amend the previous order or orders as the interests of justice may require").  This includes determining the scope of the five categories of documents identified within the DOJ report.  In order to ensure that such

a sweeping disclosure is usable by defense counsel, it will be made in an electronic format with optical character recognition.

After the underlying categories of documents have been disclosed to the plaintiffs, and individual cases and defendants affected by the department's systemic misconduct have been identified, case-by-case adjudication can begin in earnest.  See Bridgeman II, 476 Mass. at 326 (success of case-by-case adjudication depends on cooperation of district attorneys and defense counsel alike).  This measure, together with the cessation of ongoing practice of the district attorney's office as detailed above, will provide criminal defendants in Hampden County with access to exculpatory information that they constitutionally are entitled to possess.

3.  Conclusion.  We exercise our general superintendence authority to ensure that the disclosure and investigation procedures of the district attorney's office match the scope of the inescapable constitutional duties of that office.  See G. L. c. 211, § 3.  First, the discretionary approach of the district attorney's office to disclosing adverse credibility determinations made about the department's officer witnesses violates the duty of the district attorney's office to disclose. Second, the policy of the district attorney's office of not disclosing instances of officer misconduct when the identity of the offending officer cannot be clearly proven violates the duty

of the district attorney's office to disclose.  Third, we require that the district attorney's office obtain all records from the department that are known to have been reviewed by the DOJ and, subsequently, disclose them in an electronic format with optical character recognition, subject to a protective order.  Through these measures, this court provides prosecutors across the Commonwealth with a clearer understanding of their obligations, and further provides defendants in Hampden County with the means of accessing potentially exculpatory materials underlying the DOJ report.

The case is remanded to the single justice for the entry of a declaratory judgment as provided in this opinion and for further action consistent with this opinion.

So ordered.

LOWY, J. (concurring, with whom Cypher, J., joins). I agree that the practice of the office of the district attorney for the Hampden district (district attorney) of disclosing adverse credibility determinations and instances of officer misconduct when the offending officer's identity is not clearly proven only on a discretionary basis is violative of the district attorney's duty of disclosure. I also agree with the court's determination that the United States Department of Justice (DOJ) report's findings triggered the district attorney's duty to investigate. I write separately for two reasons: (1) to emphasize that, even though adverse credibility findings fall within a prosecutor's duty of disclosure, not every adverse credibility determination by a judge as to a police officer's credibility constitutes a finding that the officer was lying; and (2) to delineate the difference between the duty of investigation and the duty of inquiry.

Adverse credibility findings. The special master's report in this case importantly notes that a judge's credibility finding as to a police witness involves evaluating an amalgam of factors, including but not limited to the police witness's observations, perceptions, memories, and biases. An adverse credibility finding that a judge elected not to "credit" a witness does not inherently reflect a conclusion that a witness was lying or that a witness was not credible with respect to

other matters.  There is danger in assuming otherwise, given the centrality of credibility determinations to a given police officer's career and, more importantly, to the integrity of a police department's criminal cases.  While all adverse credibility determinations are exculpatory and must be turned over, the nature of the finding may affect the admissibility of the evidence and the nature of rehabilitation of the police witness if so impeached.

Where a judge fails to credit a police witness, and that finding is disclosed to the defendant, as it must be in cases in which that police officer has been or might be a witness, the special master recognized that "this standard means that every police officer's career is on the line every time the officer testifies before any judge.  That result . . . is inherent in the serious responsibility each police officer accepts in taking on the role."  When an adverse credibility determination is based upon a police witness's lack of testimonial faculties[1] -- as opposed to a finding that a police witness testified untruthfully -- this is not the type of credibility finding that should hinder an officer's usefulness in investigations or end

---

[1] For instance, a finding that an officer was not wearing his prescription glasses at the time he made an observation.

an officer's career.[2]  And the nature of the adverse credibility finding may well affect the admissibility of such evidence.

Although, "[i]n general, specific instances of misconduct showing the witness to be untruthful are not admissible for the purpose of attacking or supporting the witness's credibility" under Mass. G. Evid. § 608(b) (2023), "we have 'chiseled a narrow exception' to this general rule, 'recognizing that in special circumstances the interest of justice forbids strict application of the rule.'"  Matter of a Grand Jury Investigation, 485 Mass. 641, 651 (2020), quoting Commonwealth v. LaVelle, 414 Mass. 146, 151 (1993).  See also Commonwealth v. Bohannon, 376 Mass. 90, 94 (1978), S.C., 385 Mass. 733 (1982); Miller v. Curtis, 158 Mass. 127, 131 (1893).  Most recently, and most applicable in this instance, in Matter of a Grand Jury Investigation, supra at 652, we addressed a variety of factors a

---

[2] In light of the centrality of an investigating police officer's credibility to effectively prosecuting a crime, an officer's credibility is often directly linked to his or her capacity to perform essential investigatory functions.  When a given officer's credibility is compromised, so too may the broader aims of past and present investigations linked to that officer be compromised.  Accordingly, police departments, to ensure the integrity of their cases, may elect not to use officers with adverse credibility determinations in investigations moving forward.  When an adverse credibility determination is based on a finding other than that a police officer lied, such intense consequences unjustifiably deprive an officer of his or her capacity to continue serving the public honestly, which in turn deprives the public of its interest in justice.

judge may consider is deciding whether a police officer witness may be impeached with prior misconduct. In other words, a finding that the judge credited the testimony of a civilian witness over the testimony of a police officer may simply be the result of the judge's determination that the civilian witness was closer to the event or that the civilian witness's testimony was corroborated by another witness (who him- or herself may have lied). Moreover, when adverse credibility findings are admissible for impeachment purposes against a police witness, rehabilitation of that witness may include evidence pointing out the nature of the finding or even calling a character witness for truthfulness under Mass. G. Evid. § 608(a) ("evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked").

We all see things through the prism of our own experience, and witnesses may observe the same event differently for a multiplicity of reasons. That does not make one witness a liar. If we want to encourage the best and brightest to consider law enforcement careers, we must distinguish between different kinds of adverse credibility findings. That each adverse credibility finding is exculpatory to a certain extent does not, in and of itself, mean that each adverse credibility finding should be admissible in evidence or result in unwarranted or calamitous consequences for the officer, and ultimately the public.

The duty to learn of exculpatory information.  It is well established that a prosecutor has a "duty to learn of and disclose to a defendant any exculpatory evidence that is 'held by agents of the prosecution team.'"  Commonwealth v. Ware, 471 Mass. 85, 95 (2015), quoting Commonwealth v. Beal, 429 Mass. 530, 532 (1999).  In general, however, our past delineation of the duty to learn of exculpatory information has at times suffered from a lack of precision, leaving prosecutors without clear guidance as to their obligations regarding what defense counsel is entitled to in discovery.  We have expounded upon a prosecutor's duty to learn of exculpatory information in a variety of contexts -- referring to this duty to learn as both a duty to inquire and a duty to investigate.  See Commonwealth v. Frith, 458 Mass. 434, 440-441 (2010) ("'Reasonableness' is the only limitation on the prosecutor's duty of inquiry").  Compare Commonwealth v. Campbell, 378 Mass. 680, 702 (1979) (holding prosecutor had no "duty to investigate" Department of Correction records "in the remote hope of discovering something that might tend to exculpate the defendants"), with Commonwealth v. Cotto, 471 Mass. 97, 115 (2015) ("It is imperative that the Commonwealth thoroughly investigate the timing and scope of [State chemist Sonja] Farak's misconduct at the [State Laboratory Institute in Amherst (Amherst drug lab)]"), and Ware, supra ("the Commonwealth had a duty to conduct a thorough

investigation to determine the nature and extent of [Farak's] misconduct").  Though somewhat murky, our case law implicitly reveals how a prosecutor's obligation to learn of exculpatory information takes shape differently depending on the context of a case.  One discernable distinguishing factor among these cases is the extent to which the district attorney is already aware of the existence of exculpatory information.

In both Cotto and Ware, for example, we held that the Commonwealth's failure to investigate properly the scope of the known misconduct of Farak at the Amherst drug lab violated the duty to learn of exculpatory information.  See Cotto, 471 Mass. at 115 (duty of investigation case concerning Commonwealth's failure to investigate scope and timing of misconduct of State chemist); Ware, 471 Mass. at 95 (same).  Neither case used the phrase "duty of inquiry" or similar language, nor did either case discuss reasonableness as a pertinent limitation on the prosecutor's duty to learn of exculpatory information.  See generally Cotto, 471 Mass. 97; Ware, 471 Mass. 85.

In Commonwealth v. McFarlane, 493 Mass.    (2024), unbeknownst to the prosecutor, one of the testifying police witnesses had had an allegation of misconduct unrelated to the prosecutor's case levied against him.  Id. at    .  There, we did consider the reasonableness of the prosecutor's inquiry, ultimately holding that no violation of the duty to learn of

exculpatory information had occurred. Id. at     . See Frith, 458 Mass. at 440-441 (duty of inquiry case concerning prosecutor's failure to inquire of police department whether any additional reports related to incident that resulted in charges against defendant existed beyond one report prosecutor was aware of and had already disclosed to defense counsel); Commonwealth v. Donahue, 396 Mass. 590, 598-599 (1986) (duty of inquiry case concerning circumstances under which prosecutor is not obligated to inquire of exculpatory evidence in Federal Bureau of Investigation's possession).

From these cases, as well as from our broader jurisprudence in this area, we can discern an important, albeit implicit, principle about how a prosecutor can meet his or her obligation to learn of exculpatory information: in cases involving a prosecutor knowing about certain exculpatory information and failing to investigate -- duty of investigation cases -- the limit of a prosecutor's duty is determined by a need to uncover the scope of the known misconduct; and in cases involving a prosecutor having no knowledge about certain exculpatory information -- duty of inquiry cases -- the limit of a prosecutor's duty is reasonableness.

The instant case is most akin to Cotto and Ware, the duty of investigation cases. Here, the district attorney already has knowledge of a pattern of misconduct in the Springfield police

department and has failed to investigate department records known to have been reviewed by the DOJ. The district attorney is obligated to learn of the scope of the misconduct so that it can properly meet its duty to investigate and ultimately its duty to disclose. The reasonableness of pretrial inquiries into what exculpatory information members of the prosecution team may be aware of -- the duty of inquiry -- is not at issue.

I write separately to note that although our case law has been far from clear on this issue, we should avoid conflating the duty of investigation and the duty of inquiry and seek to develop the contours of the duty of inquiry only in cases involving potentially exculpatory information unknown to the prosecutor but possibly known to one or more members of the prosecution team.